**FOR PUBLICATION**



**FILED**
Oct 03 2013, 5:31 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**JAMES D. JOHNSON**
**ANGELA L. FREEL**
Rudolph, Fine, Porter & Johnson, LLP
Evansville, Indiana

**RICHARD SMIKLE**
**BRIAN PAUL**
Ice Miller, LLP
Indianapolis, Indiana

**KEVIN R. PATMORE**
Santa Claus, Indiana

ATTORNEYS FOR APPELLEE:

**TERRY G. FARMER**
**DANIEL R. ROBINSON, JR.**
Bamberger, Foreman, Oswald & Hahn, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KOCH DEVELOPMENT CORPORATION AND DANIEL L. KOCH, | ) | |
| Appellants-Defendants, | ) ) ) | |
| vs. | ) ) | No. 82A04-1212-PL-612 |
| LORI A. KOCH, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF WILLIAM A. KOCH, JR., DECEASED, | ) ) ) ) ) | |
| Appellee-Plaintiff. | ) ) | |

APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable Carl A. Heldt, Judge
Cause No. 82C01-1101-PL-5

**October 3, 2013**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Daniel L. Koch ("Dan") appeals the judgment of the Vanderburgh Circuit Court declaring that Lori A. Koch ("Lori"), as Personal Representative of the Estate of William A. Koch, Jr. ("Will"), was the owner of certain shares of Koch Development Corporation ("KDC") and did not have to sell the shares to KDC and Dan pursuant to a shareholders' agreement. Dan appeals and argues: (1) that the trial court clearly erred in determining that KDC and Dan materially breached the shareholders' agreement and (2) that the trial court erred in concluding that KDC and Dan's actions excused the Estate from performing under the shareholders' agreement.

We affirm.

### Facts and Procedural History

KDC owns and operates a theme park in Santa Claus, Indiana known as Holiday World and Splashin' Safari. Started in 1945 by Louis J. Koch ("Louis"), the park was originally known as Santa Claus Land. Louis's son, William Koch Sr. ("William"), later took over operation of the family business, and all five of William's children initially owned stock in KDC. By 2002, however, Will, Dan, and their sister, Natalie, owned all of the shares of KDC. In November 2002, KDC, Will, Dan, and Natalie entered into a Share Purchase and Security Agreement ("the Agreement"), which controlled the disposition of the outstanding shares of KDC.

Section 5 of the Agreement is titled "Mandatory Purchase on Death by Corporation or Shareholders," and provides in relevant part that:

**5.1.1 Within a period commencing with the death of any Shareholder . . . and ending upon the earlier of (i) 180 days following the qualification of that Shareholder's personal representative, or (ii) 180 days following the death of such Shareholder, the Corporation shall purchase and redeem all the shares of Common Stock owned by the decedent Shareholder's [sic] on the date of death of such decedent Shareholder at the price of $362.8184 per share.**

5.1.2 The price to be utilized for purchase under this Section 5 shall afterward be determined from time to time by the Shareholders. Initially the price shall be that as set forth in [Section] 5.1.1. If the Shareholders have not agreed in writing to a new stipulated price within twenty-four (24) months of the date of this Agreement, and every twenty-four (24) months thereafter, then, and in such event, the purchase price shall be determined by reference to the formula attached hereto as Exhibit 5.1.2.

**5.2    If during said period the Corporation does not have sufficient capital available to permit it lawfully to purchase any or all of such shares of Common Stock, then within 30 days after the end of said period, the remaining Shareholders who are then parties to this Agreement shall purchase all of the decedent Shareholder's shares of Common Stock that the Corporation is legally unable to purchase at the price per share provided in this Agreement on the following terms:**

5.2.1 A down payment of twenty-five percent (25%) of such purchase price shall be paid on the date on which the remaining Shareholders purchase the shares; and

5.2.2 The balance of such purchase price shall be paid in thirty-six (36) equal monthly installments, including interest at a fixed rate equal to the lowest applicable federal rate (as such term [is] defined by § 1274(d) of the Internal Revenue Code of 1986, as amended ("Code")) for the month on the date that such shares of Common Stock are purchased by the remaining Shareholders. Interest shall be compounded annually. Notwithstanding the foregoing, in the event the obligation is a "qualified debt instrument" (as such term is defined in Code § 1274A), the interest rate on the note shall not exceed nine percent (9%) per annum, compounded annually. Such installment payments shall commence on the last day of the month following the date on which the remaining Shareholders purchase the shares of Common Stock, and equal payments shall be made on the last day of each month thereafter until the purchase price is paid in full, except that the final payment shall be in an amount equal to the remaining amount due. All, or any part, of the unpaid balance of

3

the purchase price may be prepaid without penalty at any time. On the date of the purchase of such shares, the purchasing Shareholder or Shareholders of such shares shall deliver to the decedent Shareholder (or such decedent Shareholder's Legal Representative) a promissory note evidencing the unpaid balance of the purchase price containing the payment terms herein provided. Such promissory note shall contain commercially reasonable terms, such as the right to accelerate the balance in the event of default and the right to reasonable attorney fees in the [event] that [sic] collection efforts are commenced after default.

5.2.3 Such purchase shall be allocated among the Shareholders required to purchase such shares of Common Stock in such proportion as such Shareholders shall agree among themselves, or in the event that such Shareholders are unable to agree, then in proportion to the number of shares of Common Stock owned by such Shareholders on the date of the decedent Shareholder's death.

5.3 Nothing in this Section shall preclude the parties to the sale from agreeing to transfer property (other than cash or promissory notes) as partial or complete consideration for the payment of the purchase price.

5.4 The Corporation may apply for a policy of insurance on the life of each Shareholder to enable it to purchase the shares of Common Stock of such Shareholder. Each Shareholder agrees to do everything to cause a policy of life insurance to be issued pursuant to such application. The Corporation shall be the owner of any policy or policies of life insurance acquired pursuant to the terms of this Agreement. . . .

Appellant's App. pp. 132-33 (emphases added).

The minutes of the shareholders' meetings held in July 2008 and July 2009 ("the Minutes"), provide, "[f]or purposes of the buy/sell agreement, KDC was valued at $653.07307 per share for each of the three shareholders as of January 1, 2009." Appellant's App. pp. 140, 141. In July 2009, Dan sold 536 shares of KDC to Will at the price of $653.07307 per share. Then, four months later, in November 2009, Natalie sold her one-third interest in KDC to Will and Dan at the same price of $653.07307 per share.

4

At the conclusion of these transactions, Will owned 49,611.6 shares (sixty percent) and Dan owned 33,074.4 shares (forty percent) of KDC stock.

Tragically, on June 13, 2010, Will died unexpectedly. Will's widow, Lori, was appointed as personal representative of Will's estate ("the Estate"). Following Will's death, Dan, who had been an attorney in Florida, came to Indiana and became the President of KDC. Initially, both Dan and the Estate sought ways to avoid the financial impact of complying with the Agreement. During this time, Dan asked the Estate to waive the buy/sell provisions of the Agreement because he was concerned that he and KDC would not be able to afford the purchase, and the Estate's lawyer sent Dan a letter informing him that Lori did not want to sell Will's shares.

During the summer of 2010, Dan began to work with KDC's accountant to plan an increase in his salary as KDC president to over $1,000,000, which was approximately four times his previous salary.[1] Dan did so, at least in part, to divert corporate profits from dividends, which would otherwise be shared with the Estate,[2] to himself. Dan also wanted to more quickly pay off his debt to Natalie from his purchase of a portion of Natalie's shares. It is important to note that Dan was not behind in his payments; he simply desired to pay the debt off more quickly.

Thereafter, the Estate objected to the dramatic increase in Dan's salary and requested that Lori be added to the Board of Directors as the personal representative of the largest shareholder, and Dan had a change of heart regarding waiving the buy/sell

[1] Dan had also received loans and bonuses from KDC in the amount of $875,000, which the Estate approved of at the time.

[2] The beneficiaries of the Estate were Lori and Lori and Will's children.

5

provision of the Agreement. Through an email exchange on which he had inadvertently copied Lori, Dan indicated his desire to purchase Will's shares from the Estate pursuant to the Agreement.

On November 30, 2010, Dan asked Matt Eckert ("Eckert"), who was KDC's accountant and *de facto* financial officer, if KDC could afford to pay $5,000,000 to purchase Will's shares. Importantly, he did not ask how much KDC could legally afford to pay, as required by the Agreement. Eckert determined that KDC could afford to pay $5,000,000 toward the purchase of Will's shares without affecting its ability to pay extensive dividends and invest in a new ride. On December 3, 2010, Lori's counsel sent a letter to KDC and Dan's counsel indicating that "Lori and her children do not want to sell their stock in the corporation, even with the possibility of being able to repurchase it on some undefined basis at some undefined distant point in the future." Ex. Vol., Plaintiff's Ex. Q-3. This letter also informed KDC and Dan that, if they insisted on the purchase of the shares:

> First and foremost is the issue of price. **Our review of the records of the corporation indicate that on July 7, 2009, the shareholders stipulated a stock purchase price for purposes of the Share Purchase and Security Agreement in the amount of $653.07307 per share.** By our calculation, this results in a purchase price for our clients' stock in the amount of $32,108,729.33. I am aware that a figure of $26,595,000.00 has been used in previous discussions. This apparently was done without taking into account the previous stipulation which, under the terms of the Share Purchase and Security Agreement, is controlling as to price.
>
> The next issue is the appropriate purchaser. Under the terms of the Share Purchase and Security Agreement, the corporation is obligated to purchase the stock of my clients. **This must be accomplished within 180 days of Will's death, which I calculate to be December 10, 2010.** The amount to be purchased by the corporation is the full amount of stock less any portion for which the "corporation does not have sufficient capital available to

6

permit it to lawfully purchase" the shares. Accordingly, an analysis must be made of the amount the corporation must purchase before we determine the portion that will be purchased by [Dan] through the use of Natalie's loan and the 36 monthly installment payments that would have to be made thereafter.

The only limitation on a distribution to shareholders (such as this redemption) appears in I.C. 23-1-28-3. It provides in relevant part: "A distribution may not be made if, after giving it effect:

(1) The corporation would not be able to pay its debts as they become due in the usual course of business; or

(2) The corporation's total assets would less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution."

Based on our examination of the most recent financial information that we have in our file from the company, **it is very clear that the amount that must be purchased by the corporation under the terms of the agreement is substantially in excess of the $5,000,000 proposed in your letter. In fact, based on the analysis performed by the company's lender of the December 31, 2008 financial statements, it may actually be the full amount.** However, we are in the process of analyzing more recent financial information and attempting to make a judgment as to what the appropriate amount is. However, in light of the park's successful track record, available line of credit, and large cash position, I suggest that you begin to plan for a much larger payment.

* * *

Kathy Ettensohn has inquired as to whether or not my clients are willing to extend the deadline for performance under the terms of the Share Purchase and Security Agreement. My clients decline to extend those deadlines. Recognizing that time is rapidly approaching for the corporation to make its purchase, we will endeavor to get you our proposal for the purchase amount to be paid by the corporation as early next week as we can once we have completed our analysis. However, inasmuch as we believed we were negotiating a new arrangement which would have included the cancellation or modification of the agreement, you can understand that we have not done substantial work to determine this amount and some further time to do this will be required.

Let me also reiterate our clients' willingness to both you and the corporation of the obligation to make the purchase under the Share

7

Purchase and Security Agreement as previously discussed. **To the extent your position on buyout was motivated by a belief that our clients were going to require strict performance, please recognize that this is not the case unless you and the corporation intend to go through with the purchase. In that event, we will require strict compliance with the terms of the agreement.**

Id. (emphases added).

On December 7, 2010, KDC and Dan offered to purchase Will's shares from the Estate for a total of $26,886,014.39, based on a value of $541.93 per share.[3] With that offer, KDC tendered to the Estate a check for $5,000,000. In addition to this check, KDC also claimed a setoff to its Agreement obligations in the amount of $2,672,231.12, the balance Will owed on a promissory note to KDC dated November 13, 2009, despite the fact that the note had not yet matured, did not contain an acceleration clause, did not make Will's death an event of default, and the Estate was current on its payments on the note. KDC therefore believed that the true value of its tender was $7,672,231.12. Dan personally tendered to the Estate a check for $4,730,826.98 and an unsecured promissory note in the amount of $14,192,480.94 to make up the balance of the $26,886,014.39 total.

In a letter dated December 13, 2010, the Estate rejected these offers, stating its position that the shareholders had already come to an agreement that the shares of KDC were worth $653.07307 per share, and that the Estate's shares were therefore worth a total of $32,108,729.33.[4] The Estate also objected to the setoff of the amount of the promissory note, and repeated the Estate's assertion that KDC could afford much more

---

[3] At the time, both parties were mistaken about the total number of shares Will owned at the time of his death.

[4] Again, this was based on a mistake regarding the total number of shares owned by Will. With the correct amount of shares, the total would have been $32,399,999.92.

8

than $5,000,000 to purchase its portion of Will's shares. Lastly, the Estate's letter complained that Dan's note was not secured by a pledge of the stock purchased. The Estate gave KDC and Dan until December 31, 2010, to correct these deficiencies. Although KDC and Dan proposed settlement offers and corrected their tender to account for the correct number of shares owned by Will at the time of his death, neither KDC nor Dan otherwise altered their initial tender.[5]

On January 7, 2011, the Estate filed an action for declaratory judgment requesting that the trial court hold that that the Estate had the right to keep the KDC shares and not sell them to KDC and/or Dan pursuant to the Agreement. KDC and Dan filed a counter-claim seeking specific performance of the Agreement.

A bench trial began on October 31, 2012 and ended on November 2, 2012. On December 3, 2012, the trial court entered findings and conclusions in favor of the Estate, determining that KDC and Dan had materially breached the Agreement, thereby excusing the Estate from performance under the Agreement. The trial court's findings and conclusions provided in relevant part:

> 8. **As admitted by the defendants in their Answer and as stated in Section 9 of the Shareholders' Agreement, time was of the essence to the Shareholders' Agreement and a material part of that agreement**.
>
> 9. Pursuant to Section 5.1.2 of the Shareholders' Agreement, the parties were entitled to stipulate as to the purchase price on a per share basis applicable to the buyout of stock upon the death of a shareholder and such a stipulation would be in effect for 24 months following the date of the stipulation.

---

[5] KDC subsequently filed a claim against the Estate in Spencer Circuit Court in the amount of Will's promissory note. KDC acknowledged that there were no setoffs against this note. On April 11, 2011, the Estate filed a conditional allowance of this claim. But at no point thereafter did KDC alter its tender to remove the amount it had set off based upon Will's note.

10. In accordance with Section 5.1.2, **the parties to the Shareholders' Agreement agreed and stipulated to a per share price of $653.07307 (the "price stipulation"), which was evidenced by the June 19, 2008 Shareholders' Meeting Minutes**; the July 7, 2009 Shareholders' Meeting Minutes; the share transaction in July 2009 (but dated effective June 30, 2010) between William A. Koch, Jr. and Daniel L. Koch for the purchase of 536 shares of stock in KDC from Daniel L. Koch which used the price of $653.07307 per share, as well as the share transaction on November 13, 2009, in which Natalie Koch's shares in KDC were purchased by William A. Koch, Jr. and Daniel L. Koch which used the price of $653.07307 per share.

11. **The price stipulation was in effect as of the date of death of William A. Koch, Jr., and controlled the attempted purchases of shares owned by the Estate in KDC in this matter.**

12. On August 4, 2010, subsequent to the death of William A. Koch, Jr., Daniel L. Koch and Natalie C. Koch were elected as directors of KDC. Thereafter, acting as directors of KDC, Daniel L. Koch and Natalie C. Koch appointed Daniel L. Koch as president of the KDC.

13. At no time was Lori Koch an officer or director of KDC.

14. On December 7, 2010, KDC and Daniel L. Koch attempted to purchase the Estate's stock in KDC for a total consideration of Twenty-Six Million Eight Hundred Eighty-Six Thousand Fourteen Dollars and Thirty-nine Cents ($26,886,014.39), representing a per share price of Five Hundred Forty-one Dollars and Ninety-three Cents ($541.93).

\* \* \*

15. At all relevant times, the Estate was ready, willing, and able to perform under the Shareholders' Agreement.

16. Based upon the testimony and evidence in this case, there were a number of material defaults under the Shareholders' Agreement by KDC and Daniel L. Koch.

17. Pursuant to the price stipulation of $653.07307 per share, the purchase price for the Estate's 49,611.6 shares of KDC . . . should have been Thirty-two Million Three Hundred Ninety-Nine Thousand Nine Hundred Ninety-nine Dollars and Ninety-two Cents (32,399,999.92). The value of the tender by KDC and Daniel L. Koch of Twenty-Six Million Eight Hundred Eighty-six Thousand ($26,886,014.39) for the purchase of the Estate's shares on December 7, 2010, was materially lower than the purchase price due under the price stipulation.

18. Even if the formula contained in Exhibit 5.1.2 was controlling in this case, which it is not, KDC and Daniel L. Koch materially breached their

obligations under the Shareholder's Agreement by failing to tender the formula price as specified in Exhibit 5.1.2 of that agreement[.]

* * *

19. Irrespective of whether the correct calculation of the purchase price is determined by stipulation or the formula, **the tender by KDC and Daniel L. Koch was additionally and materially less than whatever the actual purchase price would have been by $2,672,232,12. This is due to the claimed set-off on December 7, 2010 of a promissory note owned by the Estate to KDC which could not, as a matter of law, be set-off at the time. The set-off was improper at the time inasmuch as the promissory note had not matured, was current on its payments, did not contain an acceleration clause, and did not make the death of the payor an event of default.**

20. After claiming the set-off, on December 17, 2010, KDC filed a claim against the Estate in Spencer Circuit Court representing a balance due and owning of Two Million Six Hundred Seventy-two Thousand Two Hundred Thirty-two Dollars and Twelve Cents ($2,672,232.12). KDC's representative stated under oath that there are no set-offs against the same. Upon filing the claim, the Estate filed a conditional allowance of claim with the Spencer Circuit Court. Upon filing of this allowance, the trial date was vacated. This position, contrary to the position now taken in subsequent proceedings, also estops the Estate from now claiming the set-off on December 7, 2010.

21. **Based on the testimony and evidence, KDC should have lawfully and immediately tendered between Ten Million Dollars ($10,000,000) to Nineteen Million Two Hundred Thousand Dollars ($19,200,000) at the time of purchase. The tender of only Five Million Dollars ($5,000,000) by KDC was a material breach of the Shareholders' Agreement.**

22. KDC and Daniel L. Koch were advised that the tender was deficient by letter dated December 13, 2010. The Estate agreed to an extension of time from the contractually required performance date of December 10, 2010 (180 days after the death of William A. Koch, Jr. per Section 5.1.1) to December 31, 2010 in order to allow the defendants to correct the deficiencies in their tender of December 7, 2010. Such an extension was not a waiver by the Estate of time being of the essence to the Shareholders' Agreement.

23. KDC and Daniel L. Koch failed to correct these deficiencies either prior to the extended closing deadline of December 31, 2010, or at any reasonable time thereafter.

11

**24.** **Prior to November 30, 2010, KDC and Daniel Koch made no effort to comply with the Shareholders' Agreement; rather, to the contrary, the defendants repeatedly advised the Estate of their willingness to set aside the agreement and/or waive the purchase requirement.** In addition, Daniel Koch (individually and on behalf of KDC) and Natalie Koch (on behalf of KDC) never approved the note set-off in connection with the promissory note from William A. Koch, Jr. used as partial consideration for KDC's tender; never provided the Estate of an analysis of the $5,000,000.00 payment calculation prior to discovery; **and were developing a plan whereby the Estate would not be paid Subchapter S distributions in order to allow Daniel Koch to pay himself a salary of between $875,000.00 to $1,160,000.00, all after Daniel Koch took out loans and bonuses totaling $875,000.00 in September and October of 2010.**

25. The filing of this declaratory judgment action by the Estate did not prevent or excuse KDC or Daniel L. Koch's performance under the Shareholders' Agreement.

**26. The foregoing material breaches of the Shareholders' Agreement by KDC and Daniel L. Koch permanently excuse performance by the Estate and relieves it of any obligation or duty to transfer its stock in KDC to KDC or Daniel L. Koch pursuant to the Shareholders' Agreement.**

\* \* \*

28. The Estate is entitled to judgment against the defendants on the Estate's complaint and is further entitled to judgment against the defendants on their counter-claim.

**THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED by the Court that judgment is rendered in favor of the plaintiff on its complaint and that the Estate is permanently excused from any obligation or duty to sell its shares of KDC to the defendant, KDC, or to the defendant, Daniel Koch.**

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED by the Court that the defendants and counter-claimants take nothing by way of their counter-claim.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED by the Court that the plaintiff is the owner of 49,611.6 shares of KDC's stock and KDC is ordered to issue to the Estate certificates evidencing such stock ownership.**

12

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED by the Court that the judgments contained herein shall be entered as final judgments. . . .

Appellant's App. pp. 21-29 (emphases added). Daniel now appeals.[6]

## Standard of Review

When a trial court enters findings and conclusions, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings; we then determine whether the findings support the judgment. Anderson v. Ivy, 955 N.E.2d 795, 800 (Ind. Ct. App. 2011), trans. denied. "In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." Id. (quoting Smith v. Smith, 938 N.E.2d 857, 860 (Ind. Ct. App. 2010)). We do not reweigh the evidence, and we consider only the evidence favorable to the trial court's judgment. Id. We also will not reassess witness credibility. Best v. Best, 941 N.E.2d 499, 502 (Ind. 2011). The party appealing the trial court's judgment must establish that the findings are clearly erroneous. Anderson, 955 N.E.2d at 800. "Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made." Id. (quoting Smith, 938 N.E.2d at 860). We do not defer to conclusions of law, which are evaluated *de novo*. Id.

---

[6] KDC has filed notice with this court that it has declined to participate in this appeal. However, because it was a party below, KDC is a nominal party to this appeal. See Ind. Appellate Rule 17(A).

## I. Breach

Dan claims that the trial court clearly erred when it found that he had materially breached the terms of the Agreement. However, there was evidence from which the trial court could readily find that Dan and KDC breached the terms of the Agreement in several different ways.

### A. *Share Price*

The first and foremost breach of the Agreement's terms was the fact that the tenders by Dan and KDC to buy Will's shares from the Estate did not comport with the price structure set forth in the Agreement. The Agreement called for the share price to be "determined from time to time by the Shareholders." Appellant's App. p. 132. If the Shareholders did not agree "in writing to a new stipulated price within twenty-four months of the Date of the Agreement, and every twenty-four months thereafter," then the price was to be based on the formula set forth in Exhibit 5.1.2 of the Agreement. Id. The trial court accepted the Estate's position that the parties had indeed agreed to a stipulated price of $653.07307. The trial court based this finding on the Minutes of the July 7, 2009 shareholders' meeting, which explicitly state: "For purposes of the buy/sell agreement, KDC was valued at $653.07307 per share for each of the three shareholders as of January 1, 2009." Appellant's App. p. 140. This clearly meets the requirements of the Agreement that the shareholders agree in writing to a per-share price, and the Minutes were signed by Dan as chairman of the board and Natalie as secretary.

Dan claims that he and Natalie signed the Minutes in their capacity as chairman and secretary respectively, and not individually. However, although the Agreement

14

expressly states that the agreed per-share price must be in writing, it does not require that the writing be signed by the individual shareholders. Moreover, the price of $653.07307 was listed in the Minutes of the June 19, 2008 shareholders' meeting, and at the beginning of the July 7, 2009 meeting, "[t]he minutes of the previous shareholders' meeting were read by Daniel L. Koch, Chairman of the Board. Natalie Koch moved to accept the reading of the minutes which was seconded by Will Koch *and unanimously approved*." Appellant's App. pp. 140 (emphasis added).[7] This obviously supports a finding that the parties agreed in writing to a per share price of $653.07307 for purposes of the buy/sell portion of the Agreement.[8] See Hardy v. S. Bend Sash & Door Co., 603 N.E.2d 895, 899 n.3 (Ind. Ct. App. 1992) (rejecting complaining shareholder's claim that shareholders failed to make a redetermination of stock price where the shareholders recorded the change in the price of stock in shareholder minutes and complaining shareholder did not object to this price redetermination, and in fact participated in it).

Undaunted by this trail of documentation, Dan next claims that the trial court erred in excluding testimony from him and Natalie that would have established that they did not agree to the price mentioned in the Minutes. The trial court excluded this testimony under Indiana Code section 34-45-2-4, part of Indiana's "Dead Man's Statutes." This statute provides that "a person (1) who is a necessary party to the issue or record; and (2)

---

[7] This also refutes Dan's argument that the per share price was not properly agreed to pursuant to Roberts Rules of Order. Moreover, the Agreement does not mention the precise methods by which an agreed price must be derived. It is not dispositive whether the price was agreed to pursuant to any particular rules of order.

[8] We also find it telling that, in the share transactions that occurred prior to Will's death, the parties used the per-share price of $653.07307—precisely the price agreed to in the Minutes.

whose interest is adverse to the estate; is not a competent witness as to matters against the estate." I.C. § 34-45-2-4(d). The Dead Man's statutes establish as a matter of legislative policy that claimants to an estate of a deceased person should not be permitted to present a court with their version of their dealings with the decedent. In re Estate of Rickert, 934 N.E.2d 726, 731 (Ind. 2010). "'The dead man's statute guards against false testimony by requiring that, when the lips of one party to a transaction are closed by death, the lips of the other party are closed by law.'" Id. (quoting In re Estate of Neu, 588 N.E.2d 567, 569 (Ind. Ct. App. 1992)).

We first note that it is clear that Dan is both a party to the current suit and his interests were and are clearly adverse to those of the Estate. Thus, the trial court properly excluded his testimony regarding what he, Natalie, and Will agreed to (or did not agree to) in the shareholders' meeting. With regard to Natalie, Dan argues that she was not a "necessary party" and her interests were not "contrary to the Estate."[9] Dan notes that Natalie had already sold her shares of KDC and later resigned her position working for KDC; he therefore claims that Natalie was not a necessary party to the case, nor were her interests aligned with Dan or KDC.

A "party" for purposes of Indiana Code section 34-45-2-4 means that "the witness must be a party to the issue, or if merely a party to the record then to be incompetent the witness must have an interest in the issue in favor of the party calling him and adverse to

---

[9] Dan also briefly claims that the minutes of KDC's shareholders' meeting were a statutorily-mandated public record and that he and Natalie should therefore have been permitted to testify regarding what occurred during the meeting. However, the public-record exception to the hearsay rule is inapposite to the applicability of, and reason for, the Dead Man's Statutes. See Kalwitz v. Estates of Kalwitz, 759 N.E.2d 228, 232 (Ind. Ct. App. 2001) (noting that Dead Man's Statute does not exclude evidence, but prevents a particular class of witnesses from testifying as to claims against the estate).

16

the estate." Satterthwaite v. Estate of Satterthwaite, 420 N.E.2d 287, 290 (Ind. Ct. App. 1981). "A party to the issue means the parties between whom there is a controversy submitted to the court for trial, the parties who are litigating the particular issue against whom or for whom the court will render judgment." Id. Merely having an interest in the result does not automatically render a witness a party to the issue. Id. If the witness is merely a party of record, it must appear that he has an interest in the suit in common with the party calling him. Id.

Here, several facts show that the trial court properly concluded that Natalie was a sufficiently interested party with interests adverse to those of the Estate. First, Natalie was a party to the agreement and a shareholder at the time the Agreement was entered into. She also held one-third of KDC's shares at the time of the shareholder meeting where the per-share price was agreed to. Indeed, she signed the Minutes of the shareholder meeting as secretary of KDC. Natalie was also a director of KDC and its secretary. She further received a salary as an officer and director of KDC, and only resigned her position shortly before the trial in this matter. Moreover, Natalie testified at the hearing on the admissibility of her testimony that she was concerned that, if Dan lost control of KDC, he might not be able to repay her over $10,000,000 he owed as part of the transaction in which he bought Natalie's shares of KDC. From this, the trial court properly concluded that, even if Natalie was not a party to the issue, she was a party to the record and incompetent to testify because she had an interest in favor of Dan and adverse to the Estate.

17

This is unlike Satterthwaite, where the witness at issue had been an heir to the estate, but had parted with her interest in the estate, and therefore had no interest which would render her incompetent. Id. Here, Natalie was, until shortly before trial, an officer of KDC and, even at the time of the trial, clearly had a financial interest in the continuation of Dan's control of KDC. Accordingly, the trial court did not err in excluding Natalie's testimony.[10]

B. *The Other Deficiencies in KDC's Tender*

In addition to the breach through the insufficiency of the share price offered, KDC's tender was deficient in other ways. First, KDC's tender included a setoff in the amount of $2,672,231.12 against a promissory note from Will to KDC dated November 13, 2009. KDC did so even though Will's note had not yet matured, was current on its payments, did not contain an acceleration clause, and did not make Will's death an event of default. Although Dan now argues that including the setoff would have benefitted the Estate by saving it a considerable amount of interest, the Agreement did not permit such a setoff, nor did the terms of Will's note itself. Thus, a substantial portion of KDC's tender was based on this improper set off.

---

[10] We also reject Dan's claim that the Estate waived the application of the Dean Man's Statutes by introducing the Minutes into evidence. Dan claims that the Minutes constituted "testimony" by Will. In Rickert, our supreme court held that, "[i]n order to waive objection to the competence of a witness under the Dead Man's Statute by taking advantage of a *deposition* of a person who is adverse to a decedent's estate, the estate must use the *deposition* by offering it into evidence at trial or pretrial hearing, or citing it to the court as, for example, by designating it in support of or opposition to a summary judgment motion." 934 N.E.2d at 732 (emphasis added); see also J.M. Corp. v. Roberson, 749 N.E.2d 567, 571 (Ind. Ct. App. 2001) (noting that when a party uses a *deposition* of the decedent in court, then the party who offered the deposition has waived the applicability of the Dead Man's Statutes). Here, the Minutes are not the equivalent of deposition testimony by Will.

18

The evidence favorable to the trial court's judgment also shows that KDC did not attempt to purchase as many of Will's shares as it was legally able to purchase, the standard for its performance under the Agreement. Instead, Dan asked KDC's financial officer if KDC could afford to purchase $5,000,000 of Will's shares without otherwise interrupting KDC's plan to make capital expenditures on the park or interrupting Dan's plans to pay extensive dividends. The Estate presented testimony that KDC could have afforded to purchase between $10,000,000 and $19,000,000 worth of Will's shares, and the trial court considered that testimony to be credible. Thus, KDC was able to spend from two to four times as much as it offered to the Estate. This was a clear breach of the terms of the Agreement.[11]

C. *The Untimeliness of the Tender and Lack of Attempts to Cure the Deficiencies*

Another factor to consider is that even after being notified by the Estate that their offer was insufficient, neither Dan nor KDC made any effort to correct their initial tender within the time period called for in the Agreement.[12] Dan contends, however, that time was not of the essence of the Agreement. This contention is without merit. Section 9 of the Agreement specifically states, "Time is of the essence of this Agreement." Appellant's App. p. 134. Dan argues on appeal that this provision was merely "boilerplate" language and that there is no particular reason that the parties needed to perform within 180 days of Will's death. However, Dan admitted in his answer that,

---

[11] Dan's reference to the business judgment rule is inapposite to an analysis of KDC's performance under the Agreement

[12] That is, other than to make adjustments based on the correct number of shares, which both parties had initially miscalculated.

19

under the terms of the Agreement, time was of the essence. Appellant's App. p. 51. He cannot now be heard to argue otherwise. See TWH, Inc. v. Binford, 898 N.E.2d 451, 454 (Ind. Ct. App. 2008) (observing that an admission in a current pleading is a judicial admission that is conclusive on the party making it).

This admission notwithstanding, we reject Dan's claim that the time-is-of-the-essence provision of the Agreement was merely "boilerplate" language. First, Dan does not explain why we should ignore the explicit terms of the Agreement, even if it were "boilerplate." Additionally, there is good reason to require the parties to perform within a relatively short period of time without unduly delaying the purchase of the decedent stockholder's shares. Without a quick resolution of this matter, the decedent's estate must be kept open. Also, the value of the KDC shares could fluctuate significantly if the transaction was not closed within a relatively short period of time.

To summarize, both KDC's and Dan's tenders were based on a per-share price that was significantly lower than the price agreed to by the parties, a price which was actually used by each of the shareholders in the year preceding Will's untimely death. Furthermore, KDC failed to offer to purchase as many shares as it could legally purchase, in violation of the clear terms of the Agreement, and reduced its tender by a clearly improper setoff against Will's promissory note, the latter an easily corrected defect which never was. Finally, neither KDC nor Dan made any attempt to cure their defective tenders within the time limit called for in the Agreement or within the extension granted by the Estate. Under these facts and circumstances, the trial court properly concluded that both Dan and KDC breached the terms of the agreement.

## II. Materiality of Breach

Dan next argues that the trial court failed to apply the proper analysis to ascertain whether these breaches were material. In support of his argument, Dan refers to Section 241 of the Restatement (Second) of Contracts, which provides:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981); see also Frazier v. Mellowitz, 804 N.E.2d 796, 804 Ind. Ct. App. (2004) (applying the Restatement factors).[13] Dan claims that, under the facts of the present case, these circumstances do not support a finding of a material breach. We disagree, and, as we consider each of the listed circumstances as an indicator of potential materiality, we reiterate that we are bound by our standard of review to consider only the evidence that is favorable to the trial court's judgment, along with any reasonable inferences that may be drawn from this evidence; nor are we

---

[13] To the extent that Dan relies upon Frazier in support of his claims on appeal, we would note that the issue in Frazier was whether the trial court properly granted summary judgment in a breach-of-contract claim. We held that there were genuine issues of material fact regarding the Restatement factors and that summary judgment was therefore inappropriate. Id. at 806. In contrast, here, Dan appeals after a bench trial and an adverse judgment, and Frazier is inapplicable.

21

permitted to reweigh the evidence or judge the credibility of witnesses. See Best, 941 N.E.2d at 502.

A. *Reasonably-Expected Benefit*

With regard to the first circumstance, Dan claims that the only benefit the Estate could have reasonably expected was monetary. That is, Dan argues that the Estate could never have reasonably expected to keep any of Will's shares under the Agreement. This is true, but only so long as KDC and Dan performed their obligations under the Agreement in good faith, an issue discussed at greater length below. Indeed, the parties initially sought ways of waiving or modifying the buy/sell provision of the Agreement because Lori wanted her children and her to retain Will's shares of KDC, and Dan and KDC wanted to avoid spending tens of millions of dollars to repurchase Will's shares. Still, under the terms of the Agreement, KDC and Dan were obligated to purchase Will's shares, and at least initially, the only benefit the Estate could reasonably expect under the Agreement was monetary compensation for Will's shares.

B. *Adequate Compensation*

The next circumstance to consider is the extent to which the Estate could be adequately compensated for that part of the benefit of which it was deprived. Again, Dan claims that the Estate could be adequately compensated by an award of monetary damages, plus interest. However, as we have already discussed, time was of the essence to the Agreement, and the delay in the sale of Will's shares caused by Dan and KDC's inadequate tender necessarily delayed the closing of the Estate and opened the possibility

22

of a substantial diminution in the value of the shares. Thus, it is not entirely true that the Estate could be adequately compensated by simple monetary damages.

C. *Forfeiture*

Dan spends a significant portion of his argument on the third circumstance listed in Section 241, alleging that he will suffer a "forfeiture" if the Estate is allowed to keep Will's shares. Dan correctly notes that the purpose of the Agreement was to keep the shares of KDC in the Koch family, and then seeks to extend that purpose to include *his* alleged right to run his family's business.

However, the Agreement does not bestow any right to run the family business on Dan alone. Instead, it allows any surviving shareholder to purchase the shares of a deceased shareholder. Natalie's decision to sell her shares to Will prior to his death allowed Will to become the majority shareholder of KDC and put Dan in the position of being a minority shareholder if he was unable to purchase Will's shares. While Dan would like to characterize this situation as one subjecting him to forfeiture, at most, Dan had only an opportunity or expectation that he might become majority shareholder in the event of his brother's death; there was no true forfeiture. See Myers v. Leedy, 915 N.E.2d 133, 137 n.3 (Ind. 2009) ("[F]orfeiture is defined as '[t]he divestiture of property without compensation[.]'") (quoting Black's Law Dictionary 677 (8th ed. 2004)). Dan will remain a minority shareholder owning tens of millions of dollars of stock in KDC. Thus, there was no forfeiture, and this circumstance does not weigh in favor of Dan.

23

D. *Likelihood of Cure*

The next circumstance listed in Section 241 is the likelihood that Dan and KDC, as the parties failing to perform or to offer to perform, would cure their failure, taking into account of all the circumstances including any reasonable assurances.

Here, the evidence clearly shows that KDC and Dan had no intention of curing their failure. Neither KDC nor Dan ever made a subsequent tender that corrected any of the clear deficiencies of their initial tender. Even after KDC acknowledged the impropriety of the setoff for Dan's note, it never adjusted its tender to account for this discrepancy. Dan never adjusted his personal tender to comply with the previously-agreed to purchase price of $653.07307. Neither Dan nor KDC made an offer of judgment under Indiana Trial Rule 68. Although Dan claims he had insufficient time to make any cure, the filing of the declaratory action did not prevent him from offering to perform or otherwise attempting to cure. Instead of making any effort to perform or cure, Dan and KDC stubbornly stood by their initial, low-ball offers. Thus, there was sufficient evidence for the trial court to find that Dan and KDC would not cure their failure.[14]

---

[14] Dan notes that his counsel sent a letter to counsel for the Estate stating, "I have been authorized to offer . . . the total sum of $29,336,690.67" for the Estate's shares. Appellant's App. p. 167. This amounts to $591.33 per share, which is more than the "backup" formula price. We first note that this letter was an offer to settle and should have been excluded from evidence pursuant to Indiana Evidence Rule 408. Regardless, when this letter was introduced into evidence, Dan's counsel stated that it was "not offered to prove liability for the amounts owed, in fact we do not believe that we are obligated[.]" Tr. p. 370. Furthermore, this amount is still substantially less than the price of $653.07307 per share which was agreed to by the shareholders in the Minutes.

E. *Good Faith*

The last circumstance listed in Section 241 is the extent to which Dan and KDC's behavior comported with standards of good faith and fair dealing. Of course, what constitutes good faith and fair dealing is a question of fact to be determined by the trial court sitting as the trier of fact. See Hamlin v. Steward, 622 N.E.2d 535, 540 (Ind. Ct. App. 1993). And here, there was ample evidence from which a reasonable trier of fact could have concluded that Dan and KDC did not act in good faith.

First, Dan planned to increase his salary in an effort to lessen dividends that would have benefitted Lori and her children as beneficiaries of the Estate, and he took loans and bonuses from KDC in an effort to pay the money loaned to him by Natalie. Dan did not make any financial preparations to purchase the Estate's shares until November 30, 2010, hardly a week before the 180-day deadline for doing so, and he only made the Estate aware of his intention to purchase the shares under the Agreement rather than to waive its terms when he accidentally copied Lori on an email. Dan asked KDC's financial officer if KDC could afford to commit $5,000,000 to re-purchase some of Will's shares, rather than to determine what the Agreement required, namely, the amount of capital available to KDC that could permit it to lawfully purchase Will's shares. The Estate presented credible evidence that, according to the terms of the Agreement, KDC could have afforded to pay between $10,000,000 and $19,000,000 to purchase Will's shares.

KDC improperly set off the amount of Will's promissory note despite the fact that the note had not matured, was current, contained no acceleration clause, and was not in default. Even after KDC acknowledged this error, it made no effort to adjust its tender.

25

And, as discussed above, Dan never made any offer to perform or cure his tender.[15]

These facts and circumstances would permit a reasonable trier of fact to conclude that Dan and KDC did not act in good faith.

Viewing all of the facts and circumstances in this case through the lens of Section 241 of the Restatement (Second) of Contracts leads us to conclude that the trial court did not clearly err in determining that Dan and KCD materially breached the terms of the Agreement.

### III.  Relieving the Estate of its Duty to Perform

Dan finally argues that the trial court erred when it concluded that the Estate was permanently excused from any obligation to perform under the Agreement, i.e. that the Estate was entitled to keep Will's shares and not required to sell them to KDC and Dan. However, as discussed above, Dan's and KDC's actions were material breaches that could operate to excuse the Estate of its obligation, as a matter of law.  Indeed, it is well-established Indiana law that "where a party is in material breach of a contract, he may not maintain an action against the other party or seek to enforce the contract against the other party."  Wilson v. Lincoln Fed. Sav. Bank, 790 N.E.2d 1042, 1048 (Ind. Ct. App. 2003). Thus, Dan and KDC, as the parties who first materially breached the Agreement, cannot now seek to enforce the Agreement against the Estate.

---

[15]  With regard to the letter sent by Dan's counsel referred to in footnote 14, supra, even that amount was substantially less than the price agreed to in the minutes, and the trial court was under no obligation to consider this as a show of good faith.  And again, we consider only the evidence favorable to the trial court's judgment.  Best, 941 N.E.2d at 502.

26

Still, Dan urges us to again look to the Restatement (Second) of Contracts to determine whether the Estate should be excused from performing under the Agreement. Specifically, Dan claims that Section 242 of this Restatement supports his position that, despite both his own and KDC's material breaches and bad faith, the Estate should still have been required to sell its shares under the Agreement. This section provides:

> In determining the time after which a party's uncured material failure to render or to offer performance discharges the other party's remaining duties to render performance under the rules stated in §§ 237 and 238, the following circumstances are significant:
> (a) those stated in § 241;
> (b) the extent to which it reasonably appears to the injured party that delay may prevent or hinder him in making reasonable substitute arrangements;
> (c) the extent to which the agreement provides for performance without delay, but a material failure to perform or to offer to perform on a stated day does not of itself discharge the other party's remaining duties unless the circumstances, including the language of the agreement, indicate that performance or an offer to perform by that day is important.

Restatement (Second) of Contracts § 242 (1981).

Subsection (a) of this section refers us back to Section 241 of the Restatement (Second) of Contracts, and we need not repeat that discussion. The second circumstance listed in Section 242—whether the injured party can make reasonable substitute arrangements—appears to be inapplicable here. KDC is a closely-held company whose shares are not readily exchanged on any market, and Lori expressed her desire to keep the shares.

The third factor is the extent to which the agreement provides for performance without delay. As noted above, the Agreement calls for performance within 180 days of the death of a shareholder. Section 242(c) notes that failure to perform on a stated day

27

does not, of itself, discharge the other party's remaining duties *unless* the circumstances, including the language of the agreement, indicate that performance by that day is important.

Thus, the fact that the Agreement calls for performance within 180 days of a decedent shareholder's death does not *ipso facto* mean that failure to perform by that date discharges the Estate's duties. But other circumstances, including the language of the Agreement, show that performance by that date was indeed important. Not only did the Agreement call for performance within 180 days; it explicitly provided (and Dan admitted) that time was of the essence. We therefore conclude that, even under an analysis of this section of the Restatement, timely performance was important and that KDC and Dan's failure to timely perform was a material breach that excused any obligation on the part of the Estate to sell Will's shares.

Dan complains that relieving the Estate of any obligation to sell under the Agreement effectively turns KDC and his duty to sell at the agreed-to price into a condition precedent. Dan notes that conditions precedent are generally disfavored and should be stated explicitly within the contract. See Scott-Reitz Ltd. v. Rein Warsaw Assocs., 658 N.E.2d 98, 103 (Ind. Ct. App. 1995). Dan claims that the Agreement does not say that the Estate must sell its shares *if* KDC and the remaining shareholders tender a specific price.

In response, the Estate notes that the Agreement does not expressly put *any* obligation on the part of the Estate. Instead, the obligation under the Agreement is on KDC and the surviving shareholder(s) to *purchase* the decedent shareholder's shares

28

under the terms set forth in the Agreement.  See Appellant's App. p. 131 ("the Corporation *shall* purchase and redeem all the shares of Common Stock owned by the decedent Shareholder[] on the date of such decedent Shareholder's death[.]"); Appellant's App. p. 132  ("the remaining Shareholders . . . *shall* purchase all of the decedent Shareholder's shares of Common Stock that the Corporation is legally unable to purchase[.]").  There is simply no corresponding obligation on the part of the decedent shareholder's estate to sell the shares expressed by the Agreement.  Thus, to the extent the Agreement puts any obligation on the Estate, it is only as a negative implication; i.e., KDC and the surviving shareholder(s) would be unable to fulfill their contractual obligation if the estate of the surviving shareholder was unwilling to sell the shares.

In support of his argument, Dan cites Krukemeier v. Krukemeier Mach. & Tool Co., Inc., 551 N.E.2d 885 (Ind. Ct. App. 1990).  In that case, a shareholders' agreement gave the remaining shareholders a right of first refusal when any other shareholder desired to sell stock.  The agreement also required the remaining shareholders to purchase their *pro rata* shares of a deceased shareholder's stock.  The agreement also stated that the shareholders would maintain life insurance policies during the duration of the agreement, to facilitate the immediate availability of cash for a post-mortem transfer.  However, the shareholders, all three brothers, allowed their insurance policies to lapse.  When one of the brothers attempted to sell his shares, a dispute arose over the proper share price.  The trial court ordered specific performance of the agreement, requiring the complaining brother to sell his shares at "book value," as called for in the agreement.  On appeal, this brother argued that the shareholders' agreement created "a condition

29

precedent that the life insurance be maintained for the Agreement to be binding." Id. at 889. We rejected this claim, noting that there was no "express language making the duty to abide by the Agreement conditional." Id. Thus, despite the parties' failure to maintain life insurance policies as demanded by the agreement, the obligation to sell shares at book value as set forth in the agreement was still binding on the selling party. Id.

We find Krukemeier to be readily distinguishable on its facts and on the face of the agreement it interpreted. There, the maintenance of life insurance coverage was ancillary to the main issue in dispute: the proper share price. Here, the "condition" Dan complains of *is* the main issue: the proper share price. Dan's position, taken to the extreme, would result in an absurdity. Under Dan's position, he could have offered to purchase Will's shares for $1 per share and the Estate would still be obliged to sell, with its only remedy being a suit for damages plus interest.

Simply said, Dan's position would make it possible for a party who has materially breached the agreement to avoid the consequences of its behavior by requiring the non-breaching party to still perform under the contract. This is in direct contradiction to well-established Indiana law that a party in material breach of a contract cannot seek to enforce the contract against the non-breaching party. See Wilson, 790 N.E.2d at 1048. This is precisely what happened here, and Dan, as the breaching party, cannot now attempt to force the Estate, the non-breaching party, to sell its shares.[16]

---

[16] Dan also claims that, because of a "simple" dispute about the share price he has not only been deprived of his alleged right to control his family business, but that the entire purpose of the Agreement has been frustrated. Dan argues that the purpose of the Agreement was to keep control of KDC within the Koch family. Although the Agreement does not directly state this, the fact that all of the then-existing shareholders and parties to the Agreement were siblings, does support this position. Still, we note that the

## Conclusion

While we regret seeing a family divide itself over an internal business dispute, our role is to determine whether the trial court's findings were supported by sufficient evidence and whether these findings support the trial court's judgment. Here, the evidence favorable to the trial court's decision supports the trial court's conclusion that Dan and KDC materially breached the terms of the Agreement and that this material breach excused the Estate of its obligation to perform under the Agreement. We therefore affirm the judgment of the trial court.

Affirmed.

BAKER, J., and NAJAM, J., concur.

---

Agreement did not directly prohibit the sale of shares to those who were not current shareholders, and therefore not members of the Koch family. Instead, the Agreement simply gave the existing shareholders the right of first refusal if a shareholder attempted to sell shares to someone other than an existing shareholder. Moreover, the trial court's order does not undercut the purpose of the Agreement, as the beneficiaries of the Estate included not only Lori, but Lori and Will's children, who are also members of the Koch family.