## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 06 2018, 9:21 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Dillman
Dillman Law Group
Indianapolis, Indiana

APPELLEE PRO SE

L.B.
Connersville, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| C.B., <br> *Appellant-Respondent,* <br><br> v. <br><br> L.B., <br> *Appellee-Petitioner.* | December 6, 2018 <br><br> Court of Appeals Case No. 18A-PO-1209 <br><br> Appeal from the Franklin Circuit Court <br><br> The Honorable Clay M. Kellerman, Judge <br><br> Trial Court Cause No. 24C02-1802-PO-79 |

**Najam, Judge.**

# Statement of the Case

C.B. appeals the trial court's entry of an order for protection against him and for L.B. C.B. raises a single issue for our review, which we restate as whether the trial court's order for protection is clearly erroneous.

We affirm.

# Facts and Procedural History

In January of 2018, L.B. and C.B. were married and lived together in Brookville. On January 20, while they were working in the yard, L.B. told C.B. she wanted to leave him. In response, C.B. "continually harass[ed] and badger[ed]" L.B. Tr. at 9. He "wanted [L.B.] to kiss him" and "prove that [she] didn't love him anymore." *Id.* L.B. instead "went in the house." *Id.*

In response, C.B. dumped a pickup-truck full of brush in front of the garage door, which "blocked in" L.B.'s vehicle. *Id.* L.B. called local law enforcement, who arrived, "removed [her] from the situation," and advised C.B. to remove the brush. *Id.* at 10. After C.B. had done so and L.B. was returned to the residence, C.B. twice "pushed" her aside "as he was throwing [her] belongings out of the door" and "impeded" her ability to "call 9-1-1" by taking her "phone from [her] twice." *Id.*

During the ordeal, LB. was "in fear [for her] safety." *Id.* at 10-11. She knew of a 9-mm handgun and a .44-caliber rifle in C.B.'s possession at the residence, and she hid them from C.B. because she "was afraid of what he was doing with

them." *Id.* at 7. She then left the Brookville residence and moved in with her father in Connersville.

[6] On January 25th, at about 6:15 in the morning, L.B. was returning to her father's house from work. She turned off of a state road and drove about one-half mile down a rural road. There, still about two miles from her father's house, C.B. had blocked the road with his truck. When L.B. approached, C.B. exited his truck and "threw something" at L.B. *Id.* at 11. L.B. backed up to turn around, and C.B. returned to his truck and "almost broadsided" L.B. *Id.* He then proceeded away from the scene. L.B. feared for her life during the incident.

[7] On January 28th, C.B. sent L.B. a text message that made clear he had followed her to her church's service that day. The next day, C.B. sent another message to L.B. asking her to come feed the livestock at their residence, but L.B. had previously learned that C.B. actually had sold that livestock prior to the message. Both messages caused L.B. distress and fear. In another message, C.B. sent L.B. a photograph of C.B. with a shotgun in his mouth.

[8] On yet another occasion, C.B. bought L.B. flowers. When he presented them to her, she told him that she did not love him. C.B. then "smashed the flowers," "got a gun," and "told [L.B.] that he was going to kill himself . . . right in front of [her]. He proceeded to pull the trigger. There were no bullets in the gun. He then threw the gun at [L.B.]" *Id.* at 18. But L.B. did not know there were no bullets in the gun until after C.B. had pulled the trigger.

And, after L.B. had moved into her father's residence, C.B. sent her a voice message. That message purported to convey that C.B. was shooting himself.

In early February, L.B. petitioned for an order for protection. The trial court granted a preliminary *ex parte* order for protection and then held a hearing on whether to make the *ex parte* order permanent. C.B. appeared at that hearing along with counsel. After the hearing, the trial court made the order for protection a permanent, two-year order. Using a form document, the court identified certain findings of fact and entered conclusions thereon, which included the court's finding that C.B. was "Brady disqualified"; that is, he was "prohibited from using or possessing a firearm" and was "ordered to surrender" the firearms he had in his possession.[1] Appellant's App. Vol. 2 at 9. This appeal ensued.

## Discussion and Decision

C.B. appeals the trial court's entry of the order for protection. As we have explained, orders for protection

> are similar to injunctions, and therefore in granting an order the trial court must *sua sponte* make special findings of fact and conclusions thereon. *Hanauer v. Hanauer*, 981 N.E.2d 147, 148 (Ind. Ct. App. 2013) (citing, *inter alia*, Ind. Trial Rule 52(A) and Ind. Code § 34-26-5-9(a), (f)). We apply a two-tiered standard of review: we first determine whether the evidence supports the

---

[1] Brady disqualification follows the federal Brady Handgun Violence Prevention Act of 1993. *See* 18 U.S.C.A. §§ 921-22 (West 2006).

findings, and then we determine whether the findings support the order. *Id.* at 149. In deference to the trial court's proximity to the issues, we disturb the order only where there is no evidence supporting the findings or the findings fail to support the order. *Koch Dev. Corp. v. Koch*, 996 N.E.2d 358, 369 (Ind. Ct. App. 2013), *trans. denied* (2014). We do not reweigh evidence or reassess witness credibility, and we consider only the evidence favorable to the trial court's order. *Id.* The party appealing the order must establish that the findings are clearly erroneous. *Id.* "Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. We do not defer to conclusions of law, however, and evaluate them *de novo.*" *Mysliwy v. Mysliwy*, 953 N.E.2d 1072, 1076 (Ind. Ct. App. 2011) (citation omitted), *trans. denied*.

*Fox v. Bonam*, 45 N.E.3d 794, 798-99 (Ind. Ct. App. 2015).

[11]     On appeal, C.B. first argues that the trial court's use of a form document for the order for protection requires reversal. We cannot agree. To be sure, the use of such form documents is problematic. They are prone to errors and meaningless "N/A" statements, *see* Appellant's App. Vol. 2 at 8-10, and they "weaken[] our confidence as an appellate court that the findings are the result of considered judgment by the trial court," *Cook v. Whitesell-Sherman*, 796 N.E.2d 271, 273 n.1 (Ind. 2003). Indeed, the trial court's order for protection here is clearly erroneous in two respects: the trial court, contrary to the evidence before it, erroneously found that C.B. was "not present" at the hearing and also erroneously found that L.B. was not an "intimate partner" of C.B. Appellant's App. Vol. 2 at 8.

[12]     Nonetheless, those two errors demonstrate only that, as C.B. states, "the trial court may have been distracted or in a hurry in making its decision." Appellant's Br. at 8. We decline to hold that the court's errors suggest more; indeed, the court could not have found C.B. to be Brady disqualified without having determined that the order for protection was necessary to protect an intimate partner. *See* 18 U.S.C.A. § 922(g)(8). Thus, it is clear that the court's errors are in the nature of scrivener's errors rather than substantive ones. Moreover, we are not persuaded by C.B.'s argument on appeal that those scrivener's errors, when coupled with how the court managed the proceedings, so undermines our confidence in the court's judgment as to require reversal. The evidence presented to the court supports the court's otherwise clear judgment for L.B.

[13]     C.B. also asserts that the trial court's order for C.B. to be Brady disqualified is clearly erroneous because "the evidence does not demonstrate that C.B. represents a credible threat" to the physical safety of L.B. Appellant's Br. at 10; *see* 18 U.S.C.A. § 922(g)(8)(C)(i). We cannot agree. In her testimony to the court, L.B. described numerous credible threats to her physical safety perpetrated by C.B. He blocked her vehicle in the garage of the marital residence; that same day, he "pushed" her aside as he threw her personal belongings out of the house, and while doing so he hid her phone from her so she would not be able to call 9-1-1. Tr. at 10. On a second occasion, he isolated her on a rural road, blocking her ability to pass, threw something at her, and then nearly "broadsided" her as he fled the scene. *Id.* at 11. On a third

occasion, he threatened violence with a firearm, namely, to shoot himself in front of her by pulling the trigger of an unloaded gun, and he then threw the gun at her. On a fourth occasion, he again threatened violence with a firearm when he sent her a voice mail that purported to be of him shooting himself. On a fifth occasion, he sent her a picture of him with a shotgun in his mouth. On still other occasions, he sent her messages that made it clear he was following her or attempting to lure her back to the marital residence.

[14] The evidence most favorable to the trial court's judgment readily supports the court's finding that C.B. represented a credible threat to the physical safety of L.B. such that he should be Brady disqualified, and C.B.'s argument to the contrary on appeal merely seeks to have this Court reweigh the evidence, which we cannot do. Further, insofar as C.B. suggests that the trial court was not required to find C.B. to be Brady disqualified, we conclude that the court did not abuse its discretion when it did so. Thus, we affirm the trial court's entry of the order for protection.

[15] Affirmed.

Pyle, J., and Altice, J., concur.