Ronald W. FRAZIER, Appellant–
Defendant,

v.

James A. MELLOWITZ,
Appellee–Plaintiff.

No. 49A02–0305–CV–385.

Court of Appeals of Indiana.

March 10, 2004.

Kevin P. Farrell, Marie T. Greer, Cline, Farrell, Christie & Lee, Indianapolis, IN, Attorneys for Appellant.

Larry R. Jackson, Price, Jackson, Waicukauski & Mellowitz, Indianapolis, IN, Attorney for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

In April 1999, James A. Mellowitz filed a Complaint for Declaratory Relief against

Ronald W. Frazier, seeking a determination from the trial court that Frazier had breached the terms of the parties' litigation referral agreement and that Mellowitz owed Frazier nothing under the terms of that agreement. In June 2002, Mellowitz filed a Motion for Summary Judgment, and on April 10, 2003, the trial court granted that motion. Frazier appeals and presents the following issue for review: whether the trial court erred when it entered summary judgment in favor of Mellowitz.

We reverse and remand.[1]

## FACTS AND PROCEDURAL HISTORY

In October 1989, Patrick and Lorrie Skaggs' rented mobile home burned down, causing injuries to Patrick, Lorrie, and their daughter Patricia. Lorrie's daughter, Amber Nicole Mitchell, died in the fire. Fire officials concluded that the fire was caused by an electrical short. The trailer did not have a smoke alarm, and the Skaggs' landlord had wired shut the trailer's back door.

The Skaggs initially hired Joseph Rabb to represent them in lawsuits seeking to recover damages for Amber's death and their own personal injuries. However, Rabb failed to file a lawsuit within the applicable two-year statute of limitations. Our supreme court imposed disciplinary sanctions against Rabb for his handling of the Skaggs' case. *See In re Joseph Rabb,* 704 N.E.2d 117 (Ind.1998).

The Skaggs then hired Frazier as their attorney. Frazier's representation of the Skaggs was three-fold: (1) he investigated a legal malpractice action against Rabb; (2) he filed a state court action against the

Cossell Group, L.P. ("Cossell Group"), the Skaggs' landlord; and (3) he defended the Skaggs in a federal court declaratory judgment action filed by Cossell Group's insurance carrier, Midwestern Indemnity Company ("Midwestern"). Prior to filing suit, Frazier settled the legal malpractice claim for $50,000. The Skaggs settled the claim for that amount against Frazier's advice because they needed the money. Frazier advised the Skaggs at the time of settlement that there was a likelihood that they would not recover anything in their other actions.

In state court, Frazier filed a wrongful death suit against Cossell Group based on an implied warranty of habitability theory. Cossell Group filed a motion to dismiss and argued that the Skaggs' claim was time-barred, but Frazier successfully defended that motion. In the federal court action, Midwestern argued that it was not required to provide coverage for the Skaggs' losses on several grounds.

During the time that Frazier represented the Skaggs, he started his own law practice. Frazier determined that he lacked the time and finances to pursue the Skaggs' cases on his own. In July 1996, Frazier and Mellowitz entered into a litigation referral agreement. The terms of that agreement were set forth in a letter from Mellowitz to Frazier dated July 23, 1996, which provided in relevant part:

> This will confirm our agreement that we [2] will pay you a referral fee of 25% of all attorney fees we recover on behalf of Patrick and Lorrie Skaggs, individually and on behalf of their children, Amber, deceased, and Patricia. *You have*

---

1. We heard oral argument on December 15, 2003. We deny Frazier's pending motion to strike Mellowitz's brief, and his motion to strike Mellowitz's response to Frazier's motion for oral argument is denied as moot.

2. At that that time, Mellowitz was employed with Price & Barker.

*also agreed to pay 25% of all costs and expenses in this matter as they are incurred.* Your expenses as well as our expenses will be reimbursed from any recovery which we obtain on behalf of the clients. You have also agreed to act as liaison with the clients and assist us on this matter as it proceeds.

If this does not reflect your understanding of our agreement, please let me know immediately.

(Emphasis added).

Thereafter, Mellowitz assumed primary responsibility for the Skaggs' cases, although Frazier reviewed copies of pleadings he received as they came into his office. Approximately ten months after Frazier and Mellowitz entered into the referral agreement, Mellowitz sent Frazier a letter dated May 21, 1997, which stated in part:

Pursuant to our referral agreement, you agreed to reimburse us for 25% of our expenses as they are incurred. At this time, we have incurred $3,434.00 in advanced expenses and expect to soon receive deposition bills for another $1,000.00 or so. Therefore, I would appreciate it if you would provide us with a check in the amount of at least $1,000.00 to bring this current.

Three months later on August 16, 1997, Mellowitz sent another letter to Frazier, which stated in part:

Just a reminder that we would really appreciate it if you would provide us with a check for $1,000 to keep up your share of the expenses in this case. I have recently located a new witness who was very helpful to confirming the Skaggs' version of events.

When Frazier still had not complied, Mellowitz sent another letter on November 13, 1997, which stated:

This is to follow up on my letter from August 26, 1997, which was my second letter to you about expenses in this case. As you will recall you agreed to pay 25% of the expenses as they are incurred. *I would appreciate it if you would live up to your end of the bargain, so that we do not need to consider the referral agreement void.* I am quite confident that the outcome of this matter is going to be rewarding.

(Emphasis added). The last letter Mellowitz sent to Frazier regarding payment was dated December 2, 1997, which stated: "We still have not received your check in the amount of $1000 to cover your 25% share of expenses. Is there some problem?"

In December 1998, Mellowitz negotiated a settlement with Cossell Group, in which Cossell Group agreed to pay the Skaggs $600,000 for their personal injuries, $240,000 of which went to pay the Skaggs' attorney's fees. When Frazier learned of the settlement through Patrick Skaggs, he sent Mellowitz a letter, which stated in part:

Congratulations! As you can imagine I was very happy to hear that a portion of this matter has settled. You did a great job!

\* \* \*

*I know that I owe a share of the ongoing costs.* If you would like payment please send me an invoice. If you want to delay payment until the point in time that the Defendants that have settled out make payment that would obviously be fine with me. Please let me know how you wish to proceed.

This is absolutely great news. When I made the decision way back when to enlist your expertise it was certainly the right decision. *It would be greatly appreciated if you could have someone*

*from your office notify me of an approx-
imate date when the settlement monies
are to be received.* That would assist me
greatly in planning.

(Emphases added). In response, Mellow-
itz sent Frazier a letter dated February
24, 1999, which stated in part:

As you will recall, you agreed to pay
25% of the expenses on this case as they
were incurred. You also agreed to as-
sist us on the litigation as it proceeded.
*Despite my many requests in writing
and by phone, you failed to do either,
thereby breaching any fee arrangement
and rendering it void.*
There have been at least four letters
sent to you requesting payment of ex-
penses. I have also talked with you on
the phone about this, and left several
voice mail messages about this that were
never answered by you. You never paid
any of the expenses in clear violation of
your obligation to do so. Your belated
offer to do so, made after you learned
that settlement had been achieved, is
ineffective, since the whole point of you
paying a portion of the expenses as the
litigation proceeded was to share the
risk that this case would never produce
any recovery. You assiduously avoided
that obligation throughout this litigation.

(Emphasis added).

Mellowitz filed his Complaint for Declar-
atory Relief against Frazier in April 1999.[3]
During depositions, Frazier admitted that
he had received all of Mellowitz's letters
and that he had not paid his share of the
costs and expenses (hereinafter "ex-
penses") as requested. Frazier claimed
that he did not have the money to pay
Mellowitz and that he did not believe that
"it was a serious issue." Regarding his
obligations, Frazier did not believe that

the "as they are incurred" language in the
agreement was material, but he testified
that Mellowitz's obligation to pay his share
of the expenses as they were incurred was
"a material part of the contract." Frazier's
understanding was that Mellowitz and his
firm had enough money to finance the
litigation.

Mellowitz testified in his deposition that
Frazier breached the contract in 1997, and
Mellowitz considered the contract rescind-
ed at that time. When asked what he
would have done had the Skaggs litigation
not been successful, Mellowitz indicated
that, at that point, he "would have had to
make a decision about whether to sue
[Frazier] to collect what he owed [Mellow-
itz] under the contract."

Mellowitz filed a summary judgment
motion in June 2002, and Frazier filed his
response in October 2002. Mellowitz filed
his reply in January 2003, and the trial
court heard argument in March 2003. The
trial court issued its order granting Mel-
lowitz's summary judgment motion on
April 11, 2003. This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

Our supreme court explained the well-
established standard of review for sum-
mary judgment appeals in *Owens Corning
Fiberglass Corp. v. Cobb,* 754 N.E.2d 905,
908–09 (Ind.2001), as follows:

An appellate court faces the same issues
that were before the trial court and
follows the same process. The party
appealing from a summary judgment de-
cision has the burden of persuading the
court that the grant or denial of sum-
mary judgment was erroneous. When a

---

**3.** In November 2000, Mellowitz settled the
litigation involving Midwestern for $500,000,
with $200,000 in attorney's fees.

trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having its day in court.

Summary judgment is appropriate only if the pleadings and evidence sanctioned by the trial court show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. Additionally, all facts and reasonable inferences from those facts are construed in favor of the non-moving party. If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. (Citations omitted). Additionally, "[e]ven if it appears that the nonmoving party will not succeed at trial, summary judgment is inappropriate where material facts conflict or undisputed facts lead to conflicting inferences." *Link v. Breen,* 649 N.E.2d 126, 128 (Ind.Ct.App.1995), *trans. denied.* Our summary judgment analysis "proceeds from the premise that summary judgment is a lethal weapon and that courts must be ever mindful of its aims and targets and beware of overkill in its use." *Bunch v. Tiwari,* 711 N.E.2d 844, 847 (Ind.Ct.App. 1999).

## Summary Judgment

■ In support of the trial court's summary judgment decision, Mellowitz claims that Frazier materially breached the contract when he refused to pay 25% of the litigation expenses as they were incurred. Mellowitz also asserts that he is not required to pay Frazier his 25% share of the attorneys fees recovered in settlement because once Frazier breached, it was Mellowitz's prerogative to treat the contract as terminated. In response, Frazier contends that Mellowitz acquiesced in Frazier's failure to pay the expenses as they were incurred. In addition, Frazier disputes that his failure to pay Mellowitz 25% of the expenses as they were incurred was a material breach. Specifically, Frazier claims that the facts show as a matter of law that his breach was immaterial,[4] or in the alternative, that there is a genuine issue of material fact as to whether his breach was material, which precludes summary judgment.[5]

---

**4.** Although he did not file a cross-motion for summary judgment, Frazier asserts that he is entitled to summary judgment on two grounds: (1) Mellowitz acquiesced in his delay of payment; and (2) his breach was non-material. Mellowitz disputes that this court may enter summary judgment in favor of Frazier when he did not file a cross-motion at the trial court and points out that the cases Frazier relies on to support his argument involve parties who filed cross-motions for summary judgment. *See LaSalle Cas. Ins. Co. v. American Underwriter, Inc.,* 148 Ind.App. 675, 269 N.E.2d 563 (1971); *Federal Kemper Ins. Co. v. Brown,* 674 N.E.2d 1030 (Ind.Ct.App.1997), *trans. denied.* However, Indiana Trial Rule 56(B) governs summary judgment in favor of a defending party and provides in relevant part, "When any party has moved for summary judgment, the court may grant summary judgment for any other party upon the issues raised by the motion although no motion for summary judgment is filed by such party." Accordingly, if the trial court was authorized to enter summary judgment in favor of Frazier without his filing a cross-motion, it follows that we may order the entry of judgment in Frazier's favor if the facts are undisputed and we determine that the trial court misapplied the law.

**5.** Frazier also raises an equitable unclean hands argument. But we agree with Mellowitz that because Frazier did not present his unclean hands argument to the trial court and, instead, raised it for the first time in his reply brief, he has waived that argument on appeal. *See KPMG, Peat Marwick, LLP v. Carmel Fin. Corp., Inc.,* 784 N.E.2d 1057, 1063 (Ind.Ct.App.2003) (stating arguments

## I. Material Breach

■ Central to the parties' arguments on summary judgment is whether Frazier's failure to pay his share of the expenses as they were incurred constituted a material breach. This court has long held that whether a party has committed a material breach is a question of fact, the resolution of which is dependent on several factors. *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 94 (Ind.Ct.App.2001), *trans. denied; Goff v. Graham,* 159 Ind.App. 324, 306 N.E.2d 758, 765 (1974). We have also stated that the factors to be considered in determining whether a party's failure to perform is material are:

(1) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

(2) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;

(3) The extent to which the party failing to perform has already partly performed or made preparations for performance;

(4) The greater or less hardship on the party failing to perform in terminating the contract;

(5) The willful, negligent or innocent behavior of the party failing to perform; and

(6) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract.

*Tomahawk Vill. Apts. v. Farren,* 571 N.E.2d 1286, 1293 (Ind.Ct.App.1991); *Goff,* 306 N.E.2d at 765 (quoting RESTATEMENT OF CONTRACTS, § 275 (1932)).

However, the six-factor analysis from the Restatement of Contracts was altered in the Restatement (Second) of Contracts (1981). Specifically, Murray on Contracts, § 167 (2d Rev. ed.1974), provides in relevant part:

> [Under the Restatement of Contracts], [i]f the failure of one party to perform ... is so material that it will or may result in the other party not receiving substantially what he bargained for, the duty of the injured party is discharged and he is, thereby, wholly excused from carrying out his undertaking. On the other hand, if the failure to perform ... is not of that character, the injured party retains his duty to render his promised performance. There is still a breach of contract, but the innocent party must recoup his loss for such an immaterial breach through one of the procedural devises designed for that purpose. The application of this principle prevents unreasonable forfeitures by the defaulter and, at the same time, is not unfair to the other party. The determination of materiality of a failure to perform is not susceptible to mechanical rules. Therefore, the original Restatement listed six "influential circumstances" which were intended to operate as guidelines to courts in making that determination.

\* \* \*

*The Restatement of Contracts (Second) has charted a somewhat different course in dealing with the problem of the effects of failure to perform ....* Initially, the new Restatement [6] indicates that, "it is

not presented to the trial court on summary judgment are waived on appeal); *see also French v. State,* 778 N.E.2d 816, 826 (Ind. 2002) (stating appellant waived alleged errors not raised in principal brief).

6. Murray refers to the 1973 tentative draft of the Restatement (Second) of Contracts. The official sections are referenced later in this opinion.

a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." This section emphasizes the fact that a material failure to perform operates as the nonoccurrence of a condition which has two possible effects: (1) preventing the activation of the duty, at least temporarily, and (2) discharging the duty when the condition can no longer occur. *The nonoccurrence of a condition does not immediately discharge the duty since there may still be time during which the condition can occur. Even though there has been a failure to perform (or failure to make an offer to perform) at the appointed time, the breaching party may perform or offer to perform shortly thereafter which has the effect of "curing" the breach to the extent that the breach is no longer material.* ... The new Restatement position differs from the original Restatement in suggesting that an uncured material failure to perform allows the injured party to suspend his performance. *The uncured material breach will have the effect of discharging the injured party's performance only when it is too late for performance or an offer to perform to occur, i.e., when the material failure to perform cannot be cured.* ... The new structure in the Restatement (Second) apparently requires a determination of materiality of failure to perform exclusive of any question of delay in performance. If the determination of materiality is made as to a particular failure to perform, the effect is to suspend the duty of the injured party (assuming there is time remaining for a possible cure). If the time for cure expires (determined by the "circumstances" set forth in the "delay" section), the uncured material failure to perform or offer to perform has the effect of discharging the duty of the injured party.

(Footnotes omitted and emphases added). Accordingly, under the original Restatement of Contracts, once a material breach occurs, the injured party is immediately discharged from any further obligation to perform under the contract. But under the Restatement (Second) of Contracts, an injured party is not discharged from his duty to perform unless (1) the breach is material, and (2) it is too late for performance or an offer to perform to occur. In particular, the Restatement (Second) of Contracts (1981) provides:

§ 241. Circumstances Significant in Determining Whether a Failure Is Material

In determining whether a failure to render or to offer performance is *material,* the following circumstances are significant:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

(Emphasis added). And Section 242 provides:

In determining *the time after which a party's uncured material failure to render or to offer performance discharges the other party's remaining duties to render performance* under the rules stated in §§ 237 and 238,[7] the following circumstances are significant:

(a) those stated in § 241;

(b) the extent to which it reasonably appears to the injured party that delay may prevent or hinder him in making reasonable substitute arrangements;

(c) the extent to which the agreement provides for performance without delay, but a material failure to perform or to offer to perform on a stated day does not itself discharge the other party's remaining duties unless the circumstances, including the language of the agreement, indicate that performance or an offer to perform by that day is important.

(Emphasis added). Additionally, Comment a. to § 242 regarding "cure" states:

Ordinarily there is some period of time between suspension and discharge, and during this period a party may cure his failure. Even then, since any breach gives rise to a claim, a party who has cured a material breach has still committed a breach, by his delay, for which he is liable in damages. *Furthermore, in some instances timely performance is so essential that any delay immediately results in discharge and there is no period of time during which the injured party's duties are merely suspended and the other party can cure his default.*

(Emphasis added).

█ Although neither party addresses Sections 241 and 242 of the Restatement (Second) of Contracts, those sections and the analysis therein apply to the heart of this dispute. In particular, Mellowitz alleges that Frazier's payment of litigation expenses *as they were incurred* was a material part of the agreement because through timely payment, Frazier would bear his share of the litigation risk. He further contends that that provision was so essential to the agreement that he was entitled to consider his duties under the agreement discharged when Frazier failed to pay in May 1997.[8] He also suggests that when Frazier finally did offer to pay his share of the litigation expenses *after* the Skaggs litigation had settled, it was too late for Frazier to cure his material breach because at that point, the risk that the parties had agreed to share no longer existed. Frazier, however, disputes that the "as they are incurred" language was crucial to the parties' agreement.

According to the Restatement (Second) of Contracts, to affirm summary judgment in Mellowitz's favor, we must examine the designated evidence and determine that the undisputed facts establish as a matter of law both of the following: (1) Frazier's breach was material in light of the factors

---

7. Those sections establish, in general, that a material failure of performance operates as the non-occurrence of a condition and that, where performances are to be exchanged simultaneously, each party is entitled to refuse to proceed with the simultaneous exchange until he is reasonably assured that the other party will perform. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 237, 238 (1981).

8. We disagree with Mellowitz that he would be entitled to discharge of his contract obli-

gations based on Frazier's alleged repudiation. "Repudiation of a contract must be positive, absolute, and unconditional in order that it may be treated as an anticipatory breach." *Jay County Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n*, 692 N.E.2d 905, 911 (Ind.Ct.App.1998), *trans. denied*. But Mellowitz did not designate evidence which establishes that Frazier repudiated the agreement as a matter of law.

under Section 241, and (2) in light of the factors under Section 242, it was too late for Frazier to cure his failure to perform after the Skaggs litigation had settled. While the facts relevant to those determinations are largely undisputed, we conclude that those facts support conflicting inferences, thereby rendering summary judgment improper.

In particular, in support of his contention that the breach was material, Mellowitz directs us to Frazier's deposition testimony in which he admitted that allocation of expenses is one of three "basic components" of a lawyer referral contract. Frazier also stated in his deposition that Mellowitz's obligation to pay his 75% share of the expenses as they were incurred was a material part of the contract.

Still, Frazier points out that Mellowitz has received the attorneys fees for which he bargained under the referral agreement. Based on that evidence, a jury may conclude that Mellowitz has not been deprived of the benefit he reasonably expected under the referral agreement. See RE-STATEMENT (SECOND) OF CONTRACTS § 241(a) (extent to which injured party will be deprived of benefit which he reasonably expected). That same evidence suggests that the amount Frazier owed Mellowitz is relatively insignificant and that Mellowitz can be compensated adequately in damages as a result of Frazier's failure to perform, simply by calculating interest on the modest amount owed.[9] See id. § 241(b) (extent to which injured party can be adequately compensated). In addition, in a December 1998 letter to Mellowitz, Frazier offered to pay his share of the expenses, which demonstrates his willingness to cure his failure to perform. See id.

§ 241(d) (likelihood party failing to perform will cure).

Regarding the extent to which Frazier will suffer forfeiture if the breach is treated as material, see id. § 241(c), a jury could conclude that Frazier brought the clients to Mellowitz, that Mellowitz agreed to pay a referral fee, and that forfeiture of the $110,000 fee would produce a harsh result. But a jury could also conclude that they had agreed to share the litigation risk and that forfeiture is appropriate because Frazier failed to bear that risk when he did not pay his share of expenses "as they [were] incurred."

The facts relevant to whether Frazier's behavior comports with standards of good faith and fair dealing also support conflicting inferences. See RESTATEMENT (SECOND) OF CONTRACTS § 241(e) (extent to which behavior of party who fails to perform comports with standards of good faith and fair dealing). Frazier testified in an affidavit that when Mellowitz contacted him four times in 1997 requesting payment, Frazier informed him of his ongoing financial difficulties and never refused to pay the expenses. But Mellowitz counters, in part, with evidence of Frazier's annual income in an attempt to rebut Frazier's claim that he was unable to pay.

Conflicting inferences may also be drawn from Mellowitz's correspondence to Frazier. First, Mellowitz's arguments suggest that time was of the essence and that payment of expenses as they were incurred was at the heart of the parties' agreement. However, the language of his July 1996 letter to Frazier, which set forth the terms of the parties' agreement, casts doubt on that contention. While the agreement provides that Frazier has "agreed to pay 25% of all costs and ex-

---

9. According to the Settlement Sheets for the Cossell Group and Midwestern Indemnity litigation, Mellowitz's "reimbursable expenses" were approximately $14,000. Accordingly, Frazier owed 25% of that amount, or approximately $3,500.

penses in this matter as they are incurred," Mellowitz did not set deadlines for payment, nor did the agreement state that timely payments were of the essence.

Likewise, the four letters Mellowitz sent to Frazier in 1997 requesting payment support conflicting inferences. On the one hand, a jury could infer from those letters that Frazier's payment of his share of the litigation expenses as they were incurred was an important part of the parties' agreement because Mellowitz repeatedly requested payment. On the other hand, a jury could infer from the letters that Mellowitz did not consider Frazier's failure to pay expenses as they were incurred as material because Mellowitz never stated in writing that that contract term was significant, and some of his letters contain language which indicates that the risk of losing the litigation was not as considerable as he contends after-the-fact. Specifically, in one letter Mellowitz warned Frazier to "live up to [his] end of the bargain, so that [they] do not need to consider the referral agreement void." In that same letter, however, Mellowitz told Frazier that he was "confident" that the outcome would be rewarding.

Finally, while Frazier testified that he understood Mellowitz's warning when he wrote that he did not want to have to consider the agreement void, a trier of fact could also conclude that, at the time Mellowitz wrote the four letters, he had not yet considered the agreement void and, instead, was merely encouraging Frazier to perform. And despite Mellowitz's practice of communicating with Frazier about the agreement in writing, he never wrote Frazier to notify him that he considered their agreement void until after Frazier offered payment in December 1998.

Because of the conflicting inferences which may be drawn from the designated evidence, the facts do not lead to only one conclusion on the issues of whether Frazier's breach was material and, if so, whether it was too late for Frazier to cure that material breach in December 1998. *See Owens Corning Fiberglass Corp.,* 754 N.E.2d at 909. Those conflicting inferences should be sorted out by a jury that can both weigh the inferences and judge witness credibility. Thus, we conclude that because the material facts support conflicting inferences and different outcomes, the trial court erred when it granted summary judgment in favor of Mellowitz.

## II. Acquiescence

Frazier also argues that summary judgment in Mellowitz's favor was improper because Mellowitz acquiesced in his non-performance. However, Frazier has conceded that he breached a non-material term of the agreement and, accordingly, that Mellowitz is entitled to damages. And we have already determined that under the Restatement (Second) of Contracts, Mellowitz is entitled to damages if either: (1) Frazier's breach was non-material, or (2) Frazier's breach was material but Frazier's offer to perform operated as a timely attempt to cure his breach. *See* RESTATEMENT (SECOND) OF CONTRACTS § 242 cmt. a (1981). Thus, Frazier's waiver argument comes into play only if a trier of fact determines that: (1) his failure to pay his share of the litigation expenses as they were incurred constituted a material breach, and (2) his offer to cure his material breach in December 1998 was untimely. We therefore conclude that whether Mellowitz acquiesced in Frazier's non-performance is an issue left for another day.[10]

---

10. Mellowitz points out that Frazier did not plead waiver as an affirmative defense in his

Answer as required by Indiana Trial Rule 8(C). However, Frazier raised his waiver ar-

### III. Remedies

Although we reverse the entry of summary judgment and remand for trial, we address the remedies available in the event the jury determines that Frazier's breach was material. Frazier contends that Mellowitz's remedies at law are adequate and that damages will make him whole. In contrast, Mellowitz asserts that when Frazier materially breached the contract, he was then entitled to treat the contract as terminated. Again, we conclude that the Restatement (Second) of Contracts clarifies the available remedies in the event of a material breach.

■ First, if the trier of fact determines that Frazier's breach was either non-material or material but that Frazier's offer to cure was timely, Mellowitz is entitled to recover damages. *See* RESTATEMENT (SECOND) OF CONTRACTS § 242 cmt. a. ("[S]ince any breach gives rise to a claim, a party who has cured a material breach has still committed a breach, by his delay, for which he is liable in damages."). We agree with Frazier that because Mellowitz has already recovered the amount of litigation expenses Frazier owed through settlement of the Skaggs' claims, his damages would be interest on the amount Frazier owed.

■ On the other hand, if the trier of fact determines that Frazier's breach was material, that his offer to cure in December 1998 was untimely, and that Mellowitz did not acquiesce in Frazier's failure to perform, then Mellowitz's obligation to pay Frazier his share of the attorneys fees would be discharged. *See id.* ("[W]hen it is too late for the performance or the offer to perform to occur, the failure ... has the

effect of discharging those duties.") (citing RESTATEMENT (SECOND) OF CONTRACTS § 225(2)). In that event, Mellowitz would receive the relief requested in his Complaint, that is, he would owe Frazier nothing.[11]

### CONCLUSION

We conclude that the trial court improperly granted summary judgment in favor of Mellowitz because the designated facts, although undisputed, support conflicting inferences regarding whether Frazier's breach was material and, if so, whether his attempt to cure that breach was untimely. We therefore reverse the summary judgment and remand for further proceedings consistent with this opinion.

Reversed and remanded.

ROBB, J., and MATHIAS, J., concur.

gument during summary judgment proceedings, and Mellowitz did not object.

11. In his Complaint, Mellowitz also seeks attorneys fees under Indiana Code Section 34–1–10, but that claim becomes relevant only if Mellowitz is the prevailing party at trial.