

FILED

Jul 27 2020, 8:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Peter J. Rusthoven
John R. Maley
Leah L. Seigel
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Brian C. Hewitt
Christopher J. Mueller
Hewitt Law & Mediation, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

ShermansTravel Media, LLC,

*Appellant-Defendant,*

v.

Gen3Ventures, LLC,

*Appellee-Plaintiff.*

July 27, 2020

Court of Appeals Case No.
19A-PL-3024

Appeal from the
Marion Superior Court

The Honorable
John M.T. Chavis, II, Judge

Trial Court Cause No.
49D05-1701-PL-2105

**Kirsch, Judge.**

[1] ShermansTravel Media, LLC ("Shermans") appeals the trial court's entry of summary judgment in favor of Gen3Ventures, LLC ("Gen3"). Following the breakdown of the parties' business relationship, in which Gen3 provided subscriber lists to Shermans for Shermans's use in its travel advertising business, the parties entered into a settlement agreement. Shermans agreed to make

periodic payments to Gen3 and to delete Gen3's subscriber data, and each party would dismiss its claims. Gen3 refused to dismiss its claims against Shermans on the basis that Shermans had not completely performed its obligation to delete Gen3's subscriber data. The parties filed cross-motions for summary judgment, and the trial court determined that Shermans breached the settlement agreement and entered summary judgment in favor of Gen3. Finding the question of whether Shermans substantially performed its obligations under the parties' settlement agreement is a disputed issue of material fact, we reverse and remand.

## Facts and Procedural History

[2] Shermans is an online travel media company whose business consists of selling advertising placements to travel suppliers. *Appellant's App. Vol. II* at 39. The advertising placements appear in Shermans's email products, which are distributed to a list of millions of email subscribers. *Id.* Gen3 is a marketing technology company, and its business includes the ownership and operation of websites that focus on the travel industry from which it collects subscriber email addresses. *Id.* at 13. In April of 2014, Shermans bought subscriber names from Gen3 to add to its list of subscribers. *Id.* at 39.

[3] Based on the performance of the subscriber names Shermans had previously bought from Gen3, in April of 2015 the parties entered into an Email Delivery Agreement ("the Agreement"). *Id.* at 39-40; *Appellant's App. Vol. III* at 3. On December 17, 2015, the parties modified the Agreement and entered into an

Amended Email Delivery Agreement along with an Insertion Order, collectively ("the Contract"). *Appellant's App. Vol. II* at 22. The Contract provided that the parties would share revenue generated from email advertisements sent to subscribers collected and identified by Gen3 and its affiliates and that Shermans would send emails both to its subscribers and to Gen3's subscribers. *Id.* at 158. Shermans used an email management vendor, Sailthru, Inc. ("Sailthru") to maintain its database of email addresses, send emails, and track user data, including the information for Gen3 subscribers. *Appellee's App. Vol. II* at 23. The Sailthru database housed a category of lists referred to as "All Primary Lists[,]" which added a new subset, called "Gen3 Lists[,]" that was kept separate from the ShermansTravel National List and the approximately 2,000 targeted, special interest lists were built off both of these separately maintained subsets of "All Primary Lists[,]" as illustrated below:



*Appellant's App. Vol. II* at 105, 119. In the latter part of 2016, a dispute arose between Shermans and Gen3, in which Gen3 alleged that Shermans failed to provide activity reports to Gen3 and pay outstanding invoices as required by the

Contract while Shermans contended that Gen3's quality of contract performance and the subscriber list data it provided to Shermans was poor. *Id.* at 26.

[4] On January 17, 2017, Gen3 filed a Verified Complaint for Breach of Contract ("the Complaint") against Shermans. *Id.* at 3. The Complaint alleged that Shermans committed multiple breaches of the Contract, including that Shermans had failed to deliver data that Gen3 owned and that Shermans had stopped sending emails to Gen3 subscribers on January 1, 2017. *Appellee's App. Vol. II* at 2-9. On January 19, 2017 and February 20, 2017, Gen3 owner Matthew Erdos monitored a Gen3 email account that was on Gen3's subscriber list, seed@gen3ventures.com ("the seed email address"), learned the seed email address had received emails from Shermans on those dates, and forwarded the Shermans emails to Gen3 co-owner Mason Hewitt. *Appellant's App. Vol. III* at 54-55.

[5] On March 13, 2017, Shermans filed its Answer to Plaintiff's Verified Complaint and Counterclaims Against Plaintiff, which included claims for breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, promissory estoppel, unjust enrichment, and fraudulent inducement. *Appellant's App. Vol. II* at 3, 21-50. The parties engaged in mediation and entered into a Settlement Agreement, Mutual Release, and Covenant Not To Sue ("the Settlement Agreement") on April 3, 2017 to "compromise and settle completely the disputes between them" and to "avoid the uncertainty and expense of continued litigation" and without

any admission of liability. *Appellant's App. Vol. III* at 18-22. The Settlement

Agreement, which included a payment schedule for Shermans to make

payments on the $290,080.39 it owed to Gen3, also provided as follows:

4. The following pleadings shall be prepared and filed:

a. In accordance with paragraph 7 below, on or before April 4, 2017, Shermans shall prepare and file a notice of dismissal of the Counterclaims with prejudice.

b. Within five business days of receipt of all Payments, and in accordance with paragraph 8 below, Gen3 shall prepare and file a stipulation of dismissal with prejudice.

. . . .

8. Upon timely receipt of Payments under paragraph 3 and complete performance under paragraph 9, Gen3 hereby forever releases and discharges Shermans, its parent companies, owners, members, subsidiaries, shareholders, predecessors, successors, affiliates, assigns, insurers, agents, heirs, personal representatives, and attorneys, and all other persons or entities who might be liable, none of whom admit any liability to Gen3, but who all dispute any liability to Gen3, of and from any and all manner of actions, causes of action, suits, accounts, contracts, debts, claims, and demands whatsoever, at law or in equity, and however arising, on or before the date of this release, including but not limited to, all matters asserted, or which could have been asserted, by Gen3 against Shermans in that certain action pending in the Marion Superior Court, State of Indiana, as above entitled under Cause No. 49D05-1701-PL-002105. However, if Shermans fails to timely deliver all Payments under paragraph 3 and completely perform it[s] obligations under paragraph 9, the previous sentence shall be deemed ineffective, and Gen3 shall

retain all rights to pursue all claims under the Amended Email Delivery Agreement including [those] asserted in the Lawsuit, less set off for payment made by Shermans.

9. Effective upon execution of this Settlement Agreement, Shermans shall cease to utilize any data relating to All Gen3 Subscribers in any form. Within 20 days from the date of this Agreement, Shermans shall deliver to Gen3 any data relating to All Gen3 Subscribers in any form, including without limitation clicks, opens, subscriber's subscription status, and Shermans' data describing the segment or segments applicable to each subscriber. Upon returning all data described in this paragraph and after Gen3 instructs Shermans to do so, Shermans shall remove any data related to All Gen3 Subscribers from Shermans' database(s) and shall destroy any other form of records applicable to All Gen3 Subscribers. Shermans shall execute an affidavit in confirmation that Shermans has complied with the data deletion requirements of this paragraph.

[6]     *Id.* at 18-20 (emphasis in original). Paragraph 11 of the Settlement Agreement also provided, in part, that performance of the Settlement Agreement's terms "is made and accepted in full accord and satisfaction of, compromise of, any and all disputes, that do, or may exist, between the Parties and for the purpose of terminating all such disputes and associated litigation." *Id.* at 21. The following day, Shermans filed its notice of dismissal of its counterclaims, with prejudice, against Gen3, and Gen3 filed an agreed motion to stay the proceedings and to dismiss the matter with prejudice. *Appellee's App. Vol. II* at 10, 12.

[7]     On April 5, 2017, Shermans sent Gen3 data concerning all Gen3 Subscribers via Dropbox, which was contained in two files named "ingestion_gen3_rs

(2).csv" and "ingestion_gen3_vg (2).csv" ("the April 5 Files"). *Id.* at 24, 80. On that same day, the trial court stayed the proceedings, pending "complete performance" of the Settlement Agreement. *Id.* at 14. On April 15, 2017, the seed email address received a Shermans email. *Appellant's App. Vol. III* at 55. On April 18, 2017, Shermans sent Gen3 fifty-six spreadsheets via Dropbox ("the April 18 Files"), which included data for Gen3 Subscribers who were on the Shermans special interest groups. *Appellee's App. Vol. II.* at 15, 80-81. Gen3 compared the April 5 Files and the April 18 files, and its comparison revealed that 68,521 emails were sent to 10,094 distinct Gen3 Subscribers in the thirteen-day period after the effective date of the Settlement Agreement. *Id.* at 82. On May 25, 2017, Gen3 confirmed to Shermans that Gen3 downloaded the April 5 Files and the April 18 Files it received from Shermans and directed Shermans to delete the Gen3 subscriber data. *Id.* at 26. The seed email address received another Shermans email on June 8, 2017. *Appellant's App. Vol. III* at 55. On June 15, 2017, Shermans requested that Sailthru permanently delete all Gen3 subscribers from the Shermans database, which Sailthru manages. *Appellee's App. Vol. II* at 26. On July 13, 2017, the seed email address received another Shermans email. *Appellant's App. Vol. III* at 55. Shermans engaged Sailthru to delete all the Gen3 subscriber data from the Shermans database, which was executed on July 19, 2017, and on July 27, 2017, Sailthru reported to Shermans that it completed the deletion of all Gen3 subscribers from the Shermans database. *Appellee's App. Vol. II* at 26, 47. On August 28, 2017, Shermans provided Gen3 with an affidavit stating it had deleted all Gen3 subscriber data from its database, as required by the Settlement Agreement. *Id.* at 34.

[8] Shermans made each payment required by the Settlement Agreement, and on November 24, 2017, six days before the Settlement Agreement's payment deadline, made its final payment to Gen3. *Appellant's App. Vol. II* at 106. Although Gen3 had not previously raised an issue to Shermans concerning data deletion, payments, and other matters covered by the Settlement Agreement, on November 30, 2017 Gen3 sent a letter to counsel for Shermans setting forth what Gen3 considered as breach on the part of Shermans and that it would not be dismissing the Complaint as required by the Settlement Agreement. *Appellant's App. Vol. III* at 23-40. Gen3's letter indicated that it considered the retention of Gen3 data on folders contained in GoogleDocs, GoogleDrive and Dropbox, which the parties used when they worked together, to be a breach of the Settlement Agreement's data deletion requirements. *Id.* at 42-43; *Appellee's App. Vol. II* at 39. On December 5 and 6, 2017, Shermans engaged an e-discovery vendor, Qdiscovery, to delete the Gen3 data on the GoogleDrive, GoogleDocs, and Dropbox folders, and Qdiscovery retained a copy. *Appellee's App. Vol. II* at 27, 53-68.

[9] On December 13, 2017, Gen3 filed a Motion for Pre-Trial Conference in which it sought to lift the stay and proceed with the litigation on the Contract, which the trial court granted on December 19, 2017. *Id.* at 15, 18. Shermans responded on January 17, 2018 with a Motion to Enforce Settlement and a Brief in Support of Motion to Enforce Settlement Agreement and Dismiss Claims. *Appellant's App. Vol. II* at 51-79. On March 16, 2018, Gen3 filed its Response to [Shermans'] Motion to Enforce Settlement Agreement. *Id.* at 82-

104. On August 7, 2018, Shermans filed a reply in support of its motion to enforce the Settlement Agreement. *Id.* at 112-29.

[10] On June 13, 2019, Sailthru, in response to non-party discovery requests it had received from Gen3, provided data to Gen3 concerning Gen3 Subscribers ("the June 13 Files"). *Appellee's App. Vol. II* at 90. Based on Gen3's analysis of the June 13 Files, it identified several data points, which included: (1) the user's email address; (2) the user's unique Profile ID assigned when the user is uploaded to the Sailthru database; (3) the date each email was sent to the user; (4) the source of the user's signup (whether Gen3 or another vendor); (5) whether the user resubscribed to the list at any time; (6) information used to target users for special interest group emails; (7) the user's original signup date; (8) the lifetime messages to such user; and (9) the date of the last email sent to such user. *Id.* at 82-83. Gen3's analysis of the June 13 Files indicated that 11,630 users matched the email address and Profile ID of a subscriber on the list of Gen3 Subscribers and identified the signup source for such user as either of the Gen3 subscriber lists provided to Shermans, which also showed that those users received at least 3,575,536 emails from the date of the Settlement Agreement through June 13, 2019 with some users receiving an email in January of 2019. *Id.* at 84, 86. In its analysis of the June 13 Files, Gen3 also concluded that 10,341 user profile data did not include a resubscribe date, from which it concluded that 10,341 Gen3 Subscribers were still on Shermans' current subscriber list and that the particular subset of Gen3 Subscribers

received at least 3,202,262 emails from the date of the Settlement Agreement through June 13, 2019. *Id.* at 86.

[11] On September 3, 2019, the parties filed cross-motions for summary judgment, briefs in support of the respective summary judgment motions, and designations of evidence. *Appellant's App. Vol. II* at 10-11. On October 3, 2019, each party filed a response to the other's motion for summary judgment.[1] *Id.* at 11. The trial court held a hearing on the parties' respective motions for summary judgment on October 29, 2019. At the hearing, counsel for Shermans argued that Shermans had complied with the data deletion requirement of Paragraph 9 of the Settlement Agreement because it ceased to utilize the Gen3 subscriber data, stating that "under the plain language of that obligation Shermans has ceased to utilize the Gen3 data, stopped selling against the Gen3 list, stopped initiating sends to the Gen3 list – so [Shermans] has ceased to utilize Gen3's data . . . ." *Tr. Vol. I* at 15. Counsel for Shermans further asserted that "inadvertent sends that Shermans wasn't aware of and didn't benefit from is not practical or effective use of data that's contemplated by the settlement agreement's use of the phrase 'cease to utilize.'" *Id.* at 22. Gen3's counsel maintained that, although Shermans indicated it had deleted Gen3 subscriber data based on Shermans's August affidavit stating it had done so, when Gen3

---

[1] We note that Shermans argued as part of its response to Gen3's motion for summary judgment briefing that Gen3's "new argument [concerning the June 13 Files] should not even be considered by the [trial court], and Shermans moves to exclude it, as well as Exhibits E, I, J, and K, as irrelevant, unreliable and ultimately inadmissible." *Appellant's App. Vol. II* at 230-32. There is nothing in the record to indicate that the trial court entered a ruling on this request.

discovered in late November of 2017 it "knew Shermans had its data and became extremely concerned it was *using* the Gen3 subscriber list. That is what compelled Gen3's demand in November of 2017, not the three seed e-mails. And that is why the litigation ensued that we're here for today." *Id.* at 34. Gen3's counsel argued that the Settlement Agreement did not provide for substantial performance based on its use of "unqualified, unconditional words like 'complete performance,' 'all,' 'in any form,' 'destroy any other form of records,' and 'without limitation[,]'" which rendered the doctrine of substantial performance inapplicable. *Id.* at 57. Shermans's counsel also addressed the deletion of the Gen3 subscriber data on Dropbox, GoogleDocs, and GoogleDrive, indicating that it retained QDiscovery to complete the deletion in a "defensible way" to prevent a "spoliation concern" and that Shermans does not access those documents. *Id.* at 59.

[12] On November 27, 2019, the trial court issued an order granting Gen3's motion for summary judgment and denying Shermans' motion for summary judgment. In the order, the trial court reasoned:

> Gen3's release of Shermans and its obligation to dismiss were contingent upon Sherman's "complete performance" under paragraph 9. Shermans was required to cease to use Gen3 subscriber data, return any data relating to Gen3 subscribers to Gen3, and upon returning the data and Gen3 instructions for Shermans to do so, Shermans was required to remove any Gen3 data in Shermans' databases and destroy any other form of records applicable to All Gen 3 subscribers. Shermans sent millions of emails to thousands of Gen3 subscriber[s] after the date of the Settlement Agreement.

Not all data related to Gen 3 subscribers did Shermans return or destroy. If Shermans inadvertently continued to send emails to Gen3 subscribers, they are essentially still utilizing the data related to Gen3 Subscribers. Assuming Gen3 failed to advise Shermans that Gen3 subscribers were still receiving emails from Shermans, that does not absolve Shermans of this contractual responsibility. Shermans argues that a strict liability or absolute guarantee that its efforts to halt all sends to Gen3 subscribers was not what Gen3 bargained for in the Settlement Agreement. There has been no evidence presented regarding what Gen3 bargained for other than the terms and conditions contained within the Settlement Agreement nor can the Court entertain such when its terms and conditions are unequivocal. Nevertheless, paragraph 8 of the Settlement Agreement calls for, inter alia, complete performance under paragraph 9. [Paragraph 9] required Shermans to cease to utilize any data relating to All Gen3 subscribers in any form and that, unfortunately, did not take place. Even disregarding the opinions of the Gen3 owners because Gen3 failed to lay the foundation for their opinions, both parties recognized that there were breaches by Shermans of the Settlement Agreement, i.e. DropBox, Google Drive, QDiscovery and GoogleDocs. The Court is relegated to applying the agreement as written and cannot impose its [own] views or disregard certain provisions of the agreement.

*Appellant's App. Vol. II* at 17-18. Shermans now appeals.

# Discussion and Decision

[13]     Shermans argues that summary judgment should not have been granted to Gen3. Shermans contends that the Settlement Agreement is subject to the substantial performance doctrine, and that there are material issues of fact as to whether it substantially performed, which would preclude summary judgment in favor of Gen3.

[14] On appeal from a grant of summary judgment, we stand in the shoes of the trial court and apply a de novo standard of review. *Poiry v. City of New Haven*, 113 N.E.3d 1236, 1239 (Ind. Ct. App. 2018). Summary judgment is appropriate where the designated evidence establishes that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Row v. Holt*, 864 N.E.2d 1011, 1013 (Ind. 2007). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). We consider only those materials properly designated pursuant to Indiana Trial Rule 56 and construe all factual inferences and resolve all doubts in favor of the non-moving party. *Young v. Hood's Gardens, Inc.*, 24 N.E.3d 421, 424 (Ind. 2015). We may affirm an entry of summary judgment "if it can be sustained on any theory or basis in the record." *DiMaggio v. Rosario*, 52 N.E.3d 896, 904 (Ind. Ct. App. 2016), *trans. denied*. The fact that the parties have filed cross-motions for summary judgment does not alter this standard of review or change our analysis: the party that lost in the trial court has the burden of persuading us that the trial court erred. *Denson v. Estate of Dillard*, 116 N.E.3d 535, 539 (Ind. Ct. App. 2018).

[15] Shermans argues that the Settlement Agreement is subject to the doctrine of substantial performance and cites *Gen. Disc. Corp. v. Weiss Mach. Corp.*, 437 N.E.2d 145 (Ind. Ct. App. 1982) in support of its position. It also argues that

the trial court's interpretation of the Settlement Agreement contravened other rules applicable to the construction of contracts, and that Gen3 relies on an overly literal reading of the term "complete" which effectively relieved Gen3 of showing material breach. Gen3 maintains that "complete performance" of the Settlement Agreement was a "condition precedent" to Gen3's obligation to dismiss the action and release Shermans. *Appellee's Br.* at 24. Gen3 contends that because Shermans did not completely perform the data deletion requirement substantial performance does not apply, and it cites *Gibson v. Neu*, 867 N.E.2d 188 (Ind. Ct. App. 2007) and *Dove v. Rose Acre Farms, Inc.,* 434 N.E.2d 931 (Ind. Ct. App. 1982) in support of its position that the doctrine of substantial performance is inapplicable to the Settlement Agreement.

[16] Interpretation of a settlement agreement presents a question of law and is reviewed de novo. *Bailey v. Mann*, 895 N.E.2d 1215, 1217 (Ind. 2008). Construction of settlement agreements is governed by contract law. *Ind. State Highway Comm'n v. Curtis*, 704 N.E.2d 1015, 1018 (Ind. 1998). If a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning. *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005). Courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict. *Id.* at 252.

[17] Contract law has long recognized substantial performance rather than strict performance as being sufficient in many situations. *General Discount*, 437 N.E.2d at 151. The doctrine of substantial performance "applies where performance of a nonessential condition is lacking, so that the benefits received

by a party are far greater than the injury done to him by the breach of the other party." *Dove,* 434 N.E.2d at 933. Indiana courts have applied the substantial performance doctrine in a variety of scenarios. *See Johnson v. Taylor Bldg. Corp.*, 171 Ind. App. 674, 676, 371 N.E.2d 404, 405 (1978) (holding that a contractor's failure to secure a septic permit before construction did not bar his recovery under a mechanic's lien where the contractor substantially fulfilled all requirements of the contract except for the final act of installing the septic system); *McConnell v. Fulmer*, 230 Ind. 576, 588, 105 N.E.2d 817, 819 (1952) (explaining, in the context of a challenge to rescind a deed requiring the appellant to provide living quarters to the appellee, that "the performance of [such a contract to provide living quarters] does not require perfection, but a reasonably strict and substantial compliance is sufficient."); *Sanderson v. Trump Mfg. Co.*, 180 Ind. 197, 102 N.E. 2, 11 (1913) (applying the doctrine of substantial performance in favor of an engineering company in the context of a dispute concerning the specifications, delivery, and installation, of turbine engines.)

[18] However, Indiana courts have also addressed cases in which substantial performance was held not to apply. *See Gibson*, 867 N.E.2d at 195 (holding, in the context of payments under a mortgage, that substantial performance did not apply where the "timely payment of the debt was an essential condition of the promissory note, mortgage, and release provision of the mortgage."); *Greenhaven Corp. v. Hutchcraft & Assocs., Inc.*, 463 N.E.2d 283, 286 (Ind. Ct. App. 1984) (stating that "the doctrine of substantial performance does not apply in an

action on account."); *Dove*, 434 N.E.2d at 935 (holding that the doctrine of substantial performance did not apply to an employee bonus agreement where the employee violated the bonus agreement's tardiness and absenteeism rules which was an essential condition of the bonus agreement.).

[19] Shermans directs us to *General Discount*, which we find instructive. In *General Discount*, an agreed judgment required defendants to pay $21,844.83 to the plaintiff and return certain collateral by a specified date. 437 N.E.2d at 146. The agreed judgment also provided that failure "to perform any part of this agreed judgment will constitute a default," making the agreement "null and void" and obligating defendants to pay $55,589.21 plus interest and other fees and costs. *Id.* at 147. As a result of "a good faith mistake," the defendants failed to deliver timely one item of collateral but delivered the collateral when they learned of the mistake. *Id.* at 148. The trial court rejected the plaintiff's effort to void the settlement based on the defendant's failure to return the specified collateral, noting that "the extent of nonperformance . . . is minor when weighed in light of the full value of performance tendered" by defendants, that the "defendants substantially performed[,]" and that the defendants "substantially complied with their duties and obligations as required by the Agreed Judgment." *Id.* at 148-49. On appeal, plaintiff argued that the agreed judgment "required *complete* compliance with the terms thereof," and that it was erroneous "to measure the compliance of the parties by a standard of 'substantial compliance.'" *Id.* at 150 (emphasis added). This court disagreed, noting that "[c]ontract law has long recognized substantial performance rather

than strict performance as being sufficient in many contractual situations." *Id.* at 151. We further explained that we saw "no reason why the standard should not be applied to the contractual situation of a consent judgment," when "the nonperformance by [defendants] was minor, was not willful, and did not defeat the purpose of the judgment." *Id.*

[20] Here, Paragraph 8 of the Settlement Agreement required Shermans to make the payments described in Paragraph 3 of the Settlement Agreement and to completely perform its obligation to delete Gen3's subscriber data as set forth in Paragraph 9 of the Settlement Agreement. *Appellant's App. Vol. III* at 19. Paragraph 9 of the Settlement Agreement required Shermans to "cease to utilize[2] any data relating to All Gen3 Subscribers in any form" and to "remove any data related to All Gen3 Subscribers from Shermans'[s] database(s) and shall destroy any other form of records applicable to All Gen3 Subscribers." *Id.* at 20. Regarding the Settlement Agreement as a whole, we agree with Gen3 that the Settlement Agreement required Shermans to satisfy the conditions established in both Paragraph 3 and Paragraph 9 before Gen3 was required to dismiss the Complaint. Gen3 correctly cites authority concerning the effect of a condition precedent contained within a contract; however, we disagree with Gen3 that substantial performance does not apply to the conditions in this particular situation and, unlike in *Gibson* and *Dove*, we conclude that substantial

---

[2] The Settlement Agreement does not define "utilize." Merriam-Webster's dictionary defines utilize as "to make use of: turn to practical use or account." *See utilize*, available at *https://www.merriam-webster.com/dictionary/utilize* (last visited June 30, 2020.)

performance is applicable to the parties' obligations under the Settlement Agreement. As discussed more fully below, whether Shermans substantially performed is a disputed issue of material fact. We note that there is no express provision in the Settlement Agreement stating that substantial performance does not apply, and as in *General Discount*, where complete compliance with the agreed judgment was not required, we see no reason why substantial performance does not apply to the Settlement Agreement. 437 N.E.2d at 151; s*ee also Gen. Motors Corp. v. Northrop Corp.,* 685 N.E.2d 127, 135 (Ind. Ct. App. 1997), (noting that "[c]ourts do not have the power to create for the parties a contract which they did not make, nor to insert language into a contract which was not inserted by the parties . . . and we will not undertake to rewrite the parties' contract to include such a clause.) (citation omitted), *trans. denied.*

[21] We turn next to whether there are material issues of fact as to whether Shermans substantially performed under the Settlement Agreement. Shermans argues that it did not send "millions of emails to thousands of subscribers" as the trial court stated in its order, that it deleted Gen3's subscriber data after Gen3 directed it to do so, and was unaware emails were "slipping through . . . ." *Appellant's Br.* at 22, 24. It also argues that it inflicted no "business harm on Gen3" and was not "'utilizing' Gen3 data" to further its commercial interests. *Id.* at 25. Shermans also maintains that it substantially performed its obligations under the Settlement Agreement and did not materially breach the Settlement Agreement, asserting that it had stopped "emailing Gen3 subscribers because poor performance from such emails *harmed* Shermans'[s] business" and that

summary judgment should not have been granted. *Appellant's Br.* at 26. Gen3 maintains that summary judgment was properly granted, and that the trial court's order should be affirmed.

[22] This court has long held that whether a party has committed a material breach is a question of fact, the resolution of which is dependent on several factors. *Collins v. McKinney*, 871 N.E.2d 363, 375 (Ind. Ct. App. 2007). When determining whether a breach is material, Indiana courts generally apply the factors articulated in the Restatement (Second) of Contracts § 241 (1981):

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

[23] *Collins*, 871 N.E.2d at 375 (citing *Frazier v. Mellowitz*, 804 N.E.2d 796, 803 (Ind. Ct. App. 2004)). Related to the inquiry of whether a breach is material is

whether a party has substantially performed an obligation. *See* Restatement (Second) of Contracts § 241 (1981) (stating that "[t]he considerations in determining whether performance is substantial are those listed in § 241 for determining whether a failure is material.")

[24] Here, the trial court premised its ruling that Shermans breached the Settlement Agreement on the basis of emails sent in the April 5 Files and April 18 Files, the subscribers identified in the June 13 Files, and the shared documents on GoogleDrive, GoogleDocs, and Dropbox. There is no dispute that emails were sent after the date of the Settlement Agreement, that Shermans executed an affidavit indicating that it deleted the Gen3 subscriber lists and did not initiate sends to Gen3 subscribers after July 27, 2017, and that Gen3 subscriber information was still available on the shared documents on GoogleDrive, GoogleDocs, and Dropbox after the date of the Settlement Agreement. Nevertheless, the trial court failed to recognize that there are material, factual disputes with respect to whether there was substantial performance of the Settlement Agreement, or, stated differently, whether Shermans materially breached the Settlement Agreement.

[25] First, regarding the 68,521 emails that were found to have been sent to Gen3 subscribers based on the April 5 Files and April 18 Files, the designated evidence shows that after Shermans learned that emails were being sent to Gen3 subscribers, it contacted Sailthru and began the process to delete the Gen3 subscriber lists from the database. *Appellant's App. Vol. II* at 108-109; *Appellant's App. Vol. III* at 74-75. The designated evidence also shows that over

the thirteen-day period relevant to the April 5 Files and the April 18 Files, Shermans sent "over 22 million emails" to its subscribers and that the 68,521 emails sent to Gen3 subscribers "made up less than a third of one percent, 0.3%, of the volume of emails sent by Shermans during that time." *Appellant's App. Vol. III* at 75. Gen3 disputes whether the 0.3% of emails sent during that thirteen-day period matters and contends that each email sent is a breach of the Settlement Agreement. These divergent views on the effect of the emails on the data deletion requirement of Paragraph 9 requires the trier of fact to resolve material issues of fact about whether Shermans substantially performed.

[26] Second, the results of Gen3's analysis of the data contained in the June 13 Files raises a factual question about the status of the subscribers; that is, whether the subscribers are independently acquired Shermans subscribers who overlap with Gen3 subscribers or whether they are Gen3 subscribers. *Appellant's App. Vol. III* at 63-71; *Pltf.'s Exs.* I-K. Shermans designated the affidavit of its digital marketing consultant, Zhengda Guo, which indicated that the subscribers highlighted by Gen3 were independently acquired by Shermans. *Appellant's App. Vol. III* at 76-99. In contrast, Gen3 points to its designated evidence indicating that the subscribers were Gen3 subscribers and were not independently acquired by Shermans. *Id.* at 63-71; *Pltf.'s Exs.* I-K.[3] Thus, the

---

[3] The trial court said that it was disregarding the "opinions of the Gen3 owners because Gen3 failed to lay the foundation for their opinions" with respect to Gen3's view of the June 13 files; however, the trial court appears to have relied on that information for the view that "Shermans sent millions of emails to thousands of Gen3 subscriber[s] after the date of the Settlement Agreement." *Appellant's App. Vol. II* at 17.

designated evidence shows there is a dispute with respect to the status of the subscribers in the June 13 Files.

[27] Third, Gen3 also points to the information from Gen3's subscriber data that is contained on GoogleDrive, GoogleDocs, and Dropbox as a breach of the Settlement Agreement. The designated evidence shows that Shermans immediately took steps to address the disclosure of that information on those platforms following Gen3's letter that it intended to enforce the Settlement Agreement. *Appellant's App. Vol. II* at 86. With respect to the information on Dropbox, Gen3 had requested that Shermans use Dropbox to accomplish the transfer of subscriber data to it. *Id.* at 106. On May 25, 2017, when Gen3 instructed Shermans to delete its subscriber lists, it indicated that the data "had been downloaded, so [Shermans] can delete." *Appellant's App. Vol. III* at 29. It is not entirely clear from the designated evidence whether that instruction was an instruction to delete only the April 5 Files and the April 18 Files, or if additional information needed to be deleted as the designated evidence shows Gen3 did not specifically refer to the data remaining on Dropbox, GoogleDrive, and GoogleDocs as problematic under the Settlement Agreement until its November 30, 2017 demand letter to Shermans. *Appellant's App. Vol. III* at 42-43; *Appellee's App. Vol. II* at 37-39. As noted above, Shermans worked with Sailthru, who managed Shermans's database, to take steps to delete the Gen3 subscriber data, and Shermans deleted the Gen3 subscriber data on Dropbox, GoogleDocs, and GoogleDrive when Gen3 brought that to its attention. *Appellant's App. Vol. II* at 108-09. The Settlement Agreement does

not include a specific date to delete the data, and although it includes broad language requiring Shermans to "destroy any other form of records applicable to All Gen3 Subscribers" there is a question as to whether the information contained on those platforms was in fact a material breach of the Settlement Agreement. *Appellant's App. Vol. III* at 20. Thus, there is a disputed factual question as to whether Shermans's efforts to delete the data was substantial performance of that obligation.

[28] In light of the foregoing, the designated evidence leads to the conclusion that there was a factual dispute as to whether Shermans substantially performed under the Settlement Agreement. *See Collins*, 871 N.E.2d at 375 (explaining that whether a party has committed a material breach is a question of fact); Restatement (Second) of Contracts § 241 (1981) (describing the related nature of material breach and substantial performance and setting forth the factors relevant to both.) Thus, the resolution of "the parties' differing accounts of the truth" is for the trier of fact to determine. *See Hughley*, 15 N.E.3d at 1003; *Smith v. State Lottery Comm'n of Ind.,* 812 N.E.2d 1066, 1073 (Ind. Ct. App. 2004) (noting that "[m]aterial questions of fact are not appropriate for resolution by summary judgment."), *trans. denied*. Because we conclude there are genuine issues of material fact precluding summary judgment, we reverse the trial court's entry of summary judgment in favor of Gen3 and remand for further proceedings.

[29] Reversed and remanded.

Brown, J., concurs with separate opinion.

Crone, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ShermansTravel Media, LLC,<br>*Appellant-Defendant*,<br><br>v.<br><br>Gen3Ventures, LLC,<br>*Appellee-Plaintiff*. | Court of Appeals Case No.<br>19A-PL-3024 |

**Brown, Judge, concurring.**

[30] I agree that the entry of summary judgment in favor of Gen3 was improper. According to Gen3, 68,521 emails were sent to its subscribers between April 5 and April 18, 2017, by Shermans. According to Shermans, these were sent inadvertently. In my view the number of improperly-sent emails or the ratio of improperly-sent emails to the total number of sent emails is not dispositive as to whether there was a breach of the Settlement Agreement's "cease to utilize" or other language proscription. *See* Appellant's Appendix Volume III at 20. "Utilize" connotes a benefit and there is no evidence of a benefit received by Shermans. Other factual determinations include the extent to which Shermans independently acquired the subscribers to which Gen3 points, the extent to which the presence of information on shared platforms constituted a breach, and the extent to which Shermans' actions comported with standards of good faith and fair dealing under the circumstances.

[31] Further, on August 28, 2017, Shermans provided Gen3 with an affidavit stating it had deleted all Gen3 subscribers data from its database per the terms of the Settlement Agreement. Almost three months later and ahead of its deadline, Shermans made its final payment to Gen3 under the terms of the Settlement Agreement. Only after that, and in "gotcha" litigation style did Gen3 send a letter to Shermans' counsel complaining about the data deletion, and six days later Shermans engaged QDiscovery to delete Gen3 data on the GoogleDrive, Google Docs, and Dropbox folders.

[32] Under the circumstances, the designated materials do not establish, as a matter of law, that there are no genuine issues of material fact or that Shermans breached its obligations under the Settlement Agreement, and thus the entry of summary judgment was improper.

| | |
|---|---|
| ShermansTravel Media, LLC,<br>*Appellant-Defendant,*<br><br>v.<br><br>Gen3Ventures, LLC,<br>*Appellee-Plaintiff.* | Court of Appeals Case No.<br>19A-PL-3024 |

**Crone, Judge, dissenting.**

I respectfully dissent. Assuming for argument's sake that the substantial performance doctrine applies here – a highly dubious assumption given that paragraph 8 of the Settlement Agreement specifically requires "**complete performance**" under paragraph 9 – I would hold that Shermans failed to substantially perform under the agreement as a matter of law.

Shermans overpromised regarding its ability to delete and cease utilizing Gen3's subscriber data, and it woefully underdelivered. The concurring opinion posits that "'[u]tilize' connotes a benefit[,]" slip op. at 25, but the only thing that one "utilizes" an email address for is to send an email. To say that Shermans did not "utilize" Gen3's subscriber data by sending emails is like saying that I did not "utilize" my phone by making a phone call with it. The lead opinion adopts Shermans' sleight-of-hand focus on percentages, noting that the 68,521 emails sent to Gen3 subscribers in April 2017 "'made up less

than a third of one percent, 0.3%, of the volume of emails sent by Shermans during that time.'" *Id.* at 20 (quoting Appellant's App. Vol. 3 at 75). The total number of emails that Shermans sent to its subscribers is irrelevant; the critical fact is that Shermans breached its Settlement Agreement with Gen3 **68,521** times. In no rational universe would this constitute substantial performance. *Cf. Gen'l Discount Corp.*, 437 N.E.2d at 151 (affirming trial court's finding of substantial performance where agreed judgment did not specifically require complete performance and defendant corrected sole instance of nonperformance by replacing two tractor buckets with original specified bucket). Based on these breaches alone, I would affirm the trial court's entry of summary judgment for Gen3.